# EXHIBIT

# "A"

## IN THE SUPERIOR COURT OF DEKALB COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **PEREZ MOMON** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **SELECT PORTFOLIO SERVICNG,** | ) | |
| **INC. and BANK OF NEW YORK** | ) | |
| **MELLON fka THE BANK OF NEW** | ) | |
| **YORK as TRUSTEE for the** | ) | |
| **HOLDERS of the EQQC ASSET** | ) | |
| **BACKED CERTIFICATES, SERIES** | ) | |
| **2001-1F and Does 1-10** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## COMPLAINT

COMES NOW Plaintiff Perez Momon ("Momon" or "Plaintiff") who files this

Complaint for Wrongful Foreclosure, Breach of Contract and Promissory Estoppel against

Defendants Bank of New York Mellon, formally known as The Bank of New York as

Trustee for the Holders of EQCC Asset Backed Certificates, Series 2001-1F ("BONY"), and

Select Portfolio Servicing, Inc. ("Select"), (hereinafter referred to collectively as

"Defendants").

## INTRODUCTION AND NATURE OF THE DISPUTE

This dispute arises out of Defendants' failure to honor agreements with Plaintiff. Plaintiff

brings this complaint for promissory estoppel and/or breach of contract for the failure of

Defendants to honor both the terms of their agreement with the United States Treasury for the

intended benefit of homeowners, as well as their failure to honor agreements directly with Plaintiff to modify his mortgage and thereby to set aside an unlawful foreclosure.  On or about September 30, 2003, Approved Acquisition Corp., ("AAC"), Michigan Fidelity Acceptance Corp. d/b/a Franklin Financial Group ("FFG"), and Approved Federal Savings Bank ("AFSB") by merger acquired certain assets and assumed certain liabilities of AFSB. On or about July 7, 2010, Equicredit Corporation of America by its Attorney-in-Fact Select Portfolio Serving, Inc. f/k/a Fairbanks Capital Corp assigned  to the Bank of New York Mellon, f/k/a the Bank of New York, as Trustee for the Holders of the EQCC Asset Backed Certificates, Series 2001-F. It is clear that BNY **never properly was delivered title** to the Property and thereby a cloud exists as to who actually has title.

## JURISDICTION AND VENUE

1.     Plaintiff is a natural person that is the lawful titleholder of real property located at 5730 Masters Court Stone Mountain, Georgia 30087.  (The "Property").

2.     Defendant Select Portfolio Serving, Inc. is a Utah corporation that maintains its principal place of business at 3217 Decker Lake Drive, Salt Lake City, Utah 84119. Defendant Select Portfolio Servicing, Inc. is a foreign corporation doing business in DeKalb County, Georgia and is subject to the jurisdiction and venue of this Court by virtue of having been served process through its registered agent, Corporation Service Company, at 40 Technology Parkway, NW Norcross, GA 30092. Defendant Select Portfolio Servicing, Inc. is hereinafter referred to as "Select".

3.     Defendant Bank of New York Mellon d/b/a BNY Mellon is a Pennsylvania corporation that maintains its principal place of business at 500 Grant Street, Pittsburgh, Pennsylvania 30046-4805. Defendant Bank of New York Mellon is a foreign corporation doing

business in DeKalb County, Georgia and is subject to the jurisdiction and venue of this Court by virtue of having been served process through its registered agent, CT Corporation, at 289 S. Culver Street, Lawrenceville, Georgia 30046.

4.     This Court has subject matter jurisdiction over this matter and jurisdiction is proper under Ga.  Const. Art. 6, § 4, Para. 1 and Art. 6 § I, Par.1, O.C.G.A. § 15-6-8.

5.     This Court has jurisdiction over the parties pursuant to O.C.G.A. § 9-4-2 in that an  "actual controversy" exists for judicial determination.  The Court has subject matter jurisdiction  as a Court of Equity pursuant to O.C.G.A. § 15-6-8 and O.C.G.A. § 23-1-1. At all times relevant  to this action, Georgia had in effect statutes, rules and  regulations applicable to this matter, and the Court has concurrent jurisdiction to declare the rights of the parties or express the opinion of the Court for  those, acts committed in violation of these federal and state Fair Debt Collection Practice Act  laws.

6.     Jurisdiction and venue are proper with this Court because the injuries sustained by  Plaintiff occurred in the State of Georgia in DeKalb County and Plaintiff lives in DeKalb County  and seeks  injunctive relief  pursuant to O.C.G.A. § 9-10-30 against  Defendants.

7.     In addition  venue is proper in DeKalb County because the Defendants do business in DeKalb County and  have physical business locations in DeKalb County where they conduct business and the alleged acts and omissions giving rise to this action took place in DeKalb County.

8.     Each Defendant had actual and/or constructive knowledge of the acts of the other  Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized   the acts of the other, and/or retained the benefits of said acts.

9.     Whenever and wherever reference is made in this Complaint to any  conduct of

Defendants, or any of them, such allegations or references shall also be deemed to mean the conduct of each Defendant, acting individually, jointly and severally.

## DEFENDANTS' JUDICIALLY-NOTICEABLE PATTERN AND PRACTICE OF UNLAWFUL CONDUCT

### Mellon's Participation in TARP and HAMP, and History of Violations of Its Legal Obligations.

10.     In October 2008, Bank of New York Mellon d/b/a BNY Mellon ("BNY") on became the master custodian for the United States Government as part of TARP. On or about October 13, 2008, it accepted $3 billion in Trouble Assets Relief Program ("TARP") funds in connection with its stress test.

11.     BNY cashed in under the $700 billion Troubled Assets Relief Program - even as it was hired for $20 million to administer TARP money for the U.S. Treasury.

12.     As "master custodian" for TARP and financial agent for the program, BNY safe kept billions in cash, handled accounting and recordkeeping - and kept track of limits on executive compensation at banks who were the recipients of TARP.

13.     According to Representative Dennis Kucinich (D-Ohio) whose House subcommittee investigated the taxpayer bailouts said of BONY, "The fox is now guarding the golden chicken coop." He also lamented, "It does raise eyebrows. Treasury is outsourcing oversight of a $700 billion bailout to a bank that's received bailout funds - and it's outsourcing a review of compensation caps to a bank that paid its own CEO $20 million a year."

14.     BNY was founded by Alexander Hamilton in 1784, BNY is the oldest bank in New York. It's not a retail bank with branches for consumers and doesn't sell traditional mortgages, auto loans or credit cards.  Instead it's a "bank for banks" specializing in loaning money to other banks. Prior to 2008 and even now, BNY rarely interacts with the average

consumer for home mortgages because most of its clients are investment oriented, BNY received bailout money from the Treasury Department.

15.     BNY purportedly outbid seventy (70) rival bidders in a competitive process, BNY won a three-year, $20 million contract to "receive, hold, safe keep and track all assets and cash in the TARP portfolio" - and to track and report progress on meeting newly imposed executive pay caps.

16.     In June 2009, BNY signed a contract with the U.S. Department of the Treasury ("U.S. Treasury") agreeing to participate in one or more programs that TARP authorized the Secretary of the Treasury to establish that was necessary to minimize foreclosures.

17.     Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure for eligible borrowers like the Plaintiff. Select Portfolio Servicing, Inc. ("SPS") signed a Servicer Participation Agreement ("SPA") with the U.S. Treasury on or about September 24, 2010 agreeing in its capacity as loan servicer to comply with HAMP guidelines and to perform loan modification and other foreclosure prevention services described in the program guidelines. SPS thereby became a **Participating Servicer** of HAMP. The guidelines issued by the Treasury Department set forth a detailed process whereby SPS it must:

    a.  identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;

b.  collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;

c.  institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are eligible for a modification; and

d.  provide a permanently modified loan to those homeowners who comply with the requirements during the trial period. Whether the homeowner qualifies for a modification or not, SPS is required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

18.     HAMP and its associated directives also set prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

19.     Though SPS accepted about $2 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, SPS has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

20.     Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. SPS would receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that makes it more profitable for

SPS to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by SPS because SPS does not carry a significant risk of loss in the event of foreclosure. On information and belief, SPS does not own a significant majority of the loans on which it functions as servicer.

21. Economic factors that discourage SPS from meeting its obligations under HAMP by facilitating loan modifications include the following:

a. SPS may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default. The monthly service fee that SPS, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to SPS.

b. Fees that SPS charges borrowers that are in default constitute a significant source of revenue to it. Aside from income SPA directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

22. Entering into a permanent modification will often delay SPA's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. SPS's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

23.     Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to SPS for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

24.     Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, SPS has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted over a billion of dollars from the United States. SPS's delay and obstruction tactics have taken various forms with the common result that homeowners like the Plaintiff with loans serviced by SPS, who are eligible for permanent loan modifications, and who have met the requirements for participation in HAMP, have not received permanent loan modifications to which they are entitled.

25.     Because SPS is not meeting its contractual obligations, hundreds of thousands of homeowners (including Plaintiff) are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, like the Plaintiff, SPS has left many borrowers in a state of limbo – often worse off than they were before they sought a modification from SPS. Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are unfair and deceptive under state laws.

26.     In addition to its obligations based on its contract with the Treasury Department, as a participating servicer in HAMP, SPS entered into a standardized contract with Plaintiff for a temporary trial modification of for his existing note and mortgage. The modification agreement promised that if the Plaintiff complied with the terms of the temporary modification agreement

and that Plaintiff's representations on which the offer of a modification was based continued to be true in all material respects, then he would receive a permanent modification on the same terms. The contract, known as a "Trial Period Plan" ("TPP") Agreement, is for a finite time period – normally three months –and specifies that "TIME IS OF THE ESSENCE." Plaintiff made the required payments under their TPP Agreements and expected to receive either a final modification or a denial of eligibility before the end of the trial period. Neither was forthcoming. Despite Plaintiffs' efforts, SPS refused to honor their contractual obligation to modify Plaintiff's loans permanently.

27.     Because SPS is not meeting its contractual obligations, Plaintiff has been wrongfully deprived of an opportunity to cure his delinquency, pay his mortgage loan and save his home. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with SPS, SPS has left Plaintiff's in a state of limbo – often worse off than his was before he sought a modification from SPS. Defendant's actions violate his contractual obligations, thwart the purpose of HAMP, and are unfair and deceptive under state laws.

28.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement. Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.

29.     A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met. Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably

foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

30.    The Plaintiff made an application that included personal financial information, tax information, and a statement attesting to his hardship.

31.    SPS determined Plaintiff had met HAMP's threshold requirements, based on both information already in its possession and information submitted by Plaintiff.

32.    Generally, the servicer must then determine if the borrower is eligible to receive a HAMP modification, the goal of which is to modify the terms of the loan such that for the first five years, the monthly mortgage payment is equal to 31 percent of the borrower's income.

33.    The servicer does this by applying the steps enumerated in the Program Documentation to the loan, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income.

34.    This process is known as the "waterfall." These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). See SD 09-01 (**Exhibit A**) at 8-10. SPS does not have discretion as to how this formula is applied – HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

35.    If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder. This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior

to the tender of a TPP Agreement.

36. The TPP Agreement describes a three or four month trial period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. SPS uses the standard form agreement to offer TPP Agreements to eligible homeowners. One such example of a form TPP Agreement is attached hereto as **Exhibit "B".** This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

37. The very first sentence of the form TPP Agreement used by SPS states: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

38. Section 3 of the form TPP Agreement repeats this promise: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."

39. Further, the form TPP Agreement defines a finite "trial period" (usually three months but in some cases, four months), states that "TIME IS OF THE ESSENCE" and identifies the "modification effective date" as the first day of the month following the month in which the final trial payment is due.

40. If the homeowner executes the TPP Agreement, complies with all documentation

requirements verifying the information on which the initial finding of eligibility was made and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification. The payment amount and interest rate in the modified loan are fixed for five years and equal to the payment amount and interest rate in the TPP. Thereafter, the rate may escalate annually by up to one percent until it reaches an interest cap which is the lesser of: (i) the fully indexed and fully amortizing contract rate or (ii) the Freddie Mac Primary Mortgage market Survey rate for 30-year fixed rate mortgage loans on the date the modification is prepared. Once capped, the rate is fixed for the remainder of the term. See SD 09-01 (**Exhibit A**) at 9.

41.     The TPP Agreement requires homeowners to undertake several duties that they are not otherwise obligated to undertake. Section 1 of the TPP Agreement required the homeowner to agree to undergo credit counseling, if they were asked to do so**.** Plaintiff was asked to attend complete credit counseling. In addition, the TPP Agreement requires Plaintiff to submit financial documentation that he was not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about his personal circumstances.

## BACKGROUND AND STATEMENT OF FACTS

42.     On or about February 29, 2000, Plaintiff purchased property located at 5730 Masters Court, Stone Mountain, Georgia 30087 (the "property") by Security Deed with Approved Federal Savings Bank, recorded in Deed Book 11250, pages 10 in the DeKalb County Real Estate Records. (A true and correct copy of the Security Deed is attached hereto as "**Exhibit C**"). ("Approved Federal Savings Bank Security Deed").

43.     On or about February 29, 2000, Approved Federal Savings Bank ("AFSB") purported to assign to Approved Financial Corp., ("AFC") a wholly owned subsidiary of the Approved Acquisition Corp., ("AAC") "their right, title and interest in and to that certain mortgage or trust deed, together with the note it was given to secure, executed," recorded in Deed Book 11250, Page 22 DeKalb County Real Estate Records (the "AFSB Assignment") (A true and correct copy of the purported Assignment is attached hereto as "**Exhibit D"**).

44.     On or about September 30, 2003, Approved Acquisition Corp., ("AAC"), Michigan Fidelity Acceptance Corp. d/b/a Franklin Financial Group ("FFG"), and AFSB by merger acquired certain assets and assume certain liabilities of AFSB.

45.     On or about July 7, 2010, Equicredit Corporation of America by its Attorney-in-Fact Select Portfolio Serving, Inc. f/k/a Fairbanks Capital Corp to the Bank of New York Mellon, f/k/a the Bank of New York, as Trustee for the Holders of the EQCC Asset Backed Certificates, Series 2001-F recorded in Deed Book 22058, Page 722 DeKalb County Real Estate Records (the "Equicredit Assignment") (A true and correct copy of the purported Assignment is attached hereto as "**Exhibit E**").

46.     In 2014, SPS sent Plaintiff an offer for a Workout Plan with a qualifying Trial Period Plan before a permanent loan modification would take effect, which stated, "While you have qualified for this Workout Plan it is important to understand all of the qualifications for the Permanent Modification have not been met.[1]

47.     SPS also stated, "As the loan servicer we are committed to working with you to help make the payment more affordable, unfortunately, we were unable to approve your request

---

[1] Document not list or provide a footnote for these so-called "qualifications".

for a loan modification under the federal government's Home Affordable Mortgage Program

(HAMP)."

48.     SPS required Plaintiff to certify and make representations regarding his inability

to afford his mortgage payments, make an oath to his Hardship through an Affidavit, provide

financial documentation, agree to obtain credit counseling, and finally three (3) trial payments on

1/1/2015, 2/1/2015, and 3/1/2015.

49.     Moreover, the Plaintiff satisfied all conditions and requirements under the terms

of the Trial Period Plan and fully performed all material terms of the contract.

50.     Plaintiff signed and accepted the offer and made payments in a timely manner as

provided by the Section 2. Trial Period Plan, which provides:

> "2. The Loan Trial Period Plan. On each of each of the following
> dates, payments will be made to the Lender the amount set forth
> below ("Trial Period Payment"), which includes payment for
> Escrow Items (where not prohibited by law, including real estate
> taxes, insurance premiums, mortgage insurance premiums and other
> fees, if any, of $521.54.
>
> 1.  1/1/2015         $1,767.90
> 2.  2/1/2015         $1,767.90
> 3.  3/1/2015         $1,767.90
>
> The Trial Period Payment is an **estimate** of the payment that will be
> required under the modified loan terms, which will be finalized in
> accordance with Section 3 below.
>
> During the period (the "Trial Period") commencing on the date of
> this Plan and ending on the earlier of: (i) first day of the month
> following the month in which the last Trial Period Payment is due
> (the "Modification Effective Date") or (ii) termination of this Plan,
> I understand and acknowledge that:
>
> A.  TIME IS OF THE ESSENCE under this Plan: ….
>
> 4.  **The Modification.** I understand that once Lender is able to
>      determine the final amounts of unpaid interest and any other
>      delinquent amounts (except late charges) to be added to the

loan balance and after deducting from the loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount. If the requirements in Section 2 are complied with and my representations in Section 1 continue to be true in all material respects, the Lender may send me a Modification Agreement for my signature which will modify the Loan Documents as necessary to reflect this new estimated payment amount and waive any unpaid late charges accrued to date. Upon proper execution of a Modification Agreement, this Plan shall terminate and the Loan Documents, as modified by the Modification Agreement, shall govern the terms for the remaining period of the loan."

5.   On or about January 1, 2015, Plaintiff made his first TPP to SPS.

52.   On or about February 1, 2015, Plaintiff made his second Trial Period Payment to SPS.

53.   On or about March 1, 2015, Plaintiff sent his third and supposedly last Trial Period Payment to SPS per terms of the Trial Period Plan (TPP).

54.   On or about March 28, 2013, Plaintiff sent SPS a letter inquiring about the status of his modification.

55.   Plaintiff continued to communicate with SPS regarding the status of his modification and continued to make so-called Trial Period Payments.

56.   The Plaintiff received neither the tender of a permanent loan modification, although he complied with all requirements under the TPP, nor notification that he was ineligible prior to the expiration of his trial period.

57.   SPS is bound to honor its TPP Agreement, however, the Plaintiff received neither the tender of a permanent loan modification, nor notification of ineligibility prior to the expiration of the trial period. Instead, once the servicing of the loan was transferred to Green

Tree, the Plaintiffs have not been given a determination as to their modification and would it be honored.

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT AND BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING FOR VIOLATIONS OF LAW ARISING FROM TPP AGREEMENTS

58.     Plaintiff incorporates and restates paragraphs 1 through 57 as if set forth in full herein.

59.     As described above, the standard TPP Agreements sent by SPS to Plaintiff constitute a valid offer.

60.     By executing the TPP Agreement and returning it to SPS along with the supporting documentation, and making the TPP payments, Plaintiff accepted SPS's offer.

61.     Alternatively, Plaintiff return of the TPP Agreement constituted an offer. Acceptance of this offer occurred when SPS accepted Plaintiff's TPP payments.

62.     The TPP Agreement was supported by consideration. First, Plaintiff's TPP payments to SPS constitute consideration. By making those payments, Plaintiff gave up the ability to pursue other means of saving his home in exchange for SPS' promise give Plaintiff a permanent modification.  Further, the TPP Agreement required the Plaintiff to undertake several duties that he was not otherwise obligated to undertake. Section 1 of the TPP Agreement required the Plaintiff to agree to undergo credit counseling, if he was asked to do so. In addition, the TPP Agreement required Plaintiff to submit financial documentation that he was not otherwise required to provide, to set up newly established escrow accounts, and to make legally binding representations about his personal circumstances. These actions constitute both a detriment to the Plaintiff and a benefit to SPS.

63.     Plaintiff and SPS thereby formed valid contracts.

64.     To the extent that the contract was subject to a condition subsequent by providing SPS an opportunity to review the documentation submitted by Plaintiff when he returned the signed TPP Agreement, to determine its sufficiency, this condition was waived by SPS in that they failed to timely raise it and/or it is estopped to assert it as a defense to Plaintiff's claims.

65.     By failing to offer Plaintiff a permanent HAMP modification, SPS breached the contract.

66.     Plaintiff remains ready, willing and able to perform under the contract.

67.      Plaintiff has suffered harm and is threatened with additional harm from Defendants' breach, including but not limited to longer loan payoff times, higher principal balances, improper negative reporting to credit bureaus; inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.

68.     Plaintiff was not tendered a permanent modification, his injury is measured by the difference between his current circumstances and the terms of the modification that he was entitled to – a difference that includes the wrongful loss of a property interest that he suffered because of the foreclosure.

69.     By making TPP payments both during and after the TPP, Plaintiff missed other remedies that he might pursued to save their home, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with a default, such as selling his home.

70.     Defendants are obligated by contract and common law to act in good faith and to deal fairly with Plaintiff so as to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

71.     Defendants routinely and regularly acted in bad faith and breached its duty for its own economic benefit by:

   a.  Failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;

   b.  Failing to properly train and supervise its agents and employees, including without limitation, its loss mitigation and collection personnel, foreclosure personnel, and personnel implementing its modification programs;

   c.  Failing to permanently modify loan and/or provide alternatives to foreclosure and using unfair means to keep Plaintiff in trial periods of indeterminate lengths, including, without limitation, routinely demanding information it already possessed and failing to communicate accurately or consistently with Plaintiff about the status of his loan modification applications;

   d.  Making inaccurate calculations and determinations of Plaintiff's eligibility for a permanent modification;

   e.  Encouraging and/or allowing its employees and agents to make inaccurate statements regarding Plaintiff's eligibility for permanent loan modifications under HAMP;

   f.  Failing to follow through on written and implied promises;

   g.  Failing to follow through on contractual obligations; and

   h.  Failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

72.     As a result of these failures to act in good faith and the absence of fair dealing, Defendants caused Plaintiff harm, as alleged above. Defendants bad faith was thus to Plaintiff's detriment.

### SECOND CAUSE OF ACTION – WRONGFUL FORECLOSURE

73.     Plaintiff refers and incorporates by reference the Paragraphs 1 through 72 as if fully set forth herein.

74.     Defendant SPS foreclosed on the Plaintiff's Property in its own name and has not asserted that it is acting as an agent.

75.     The Plaintiff's Promissory Note and Security Deed were not properly endorsed, transferred or assigned to the investment trust.

76.     Georgia law requires the entity foreclosing to be a legal holder of either the note or security deed.

77.     Defendant SPS does not legally hold a properly endorsed note which would authorize it to exercise the power of sale provision in the Security Deed.

78.     Defendant SPS also did not validly hold the Security Deed which also would authorize it to exercise the power of sale provision in the Security Deed.

79.     The real party in interest is the investor that owns the loan, which also is not Defendant BNY.

80.     There is a statutory duty upon the Defendant SPS to exercise fairly and in good faith the power of sale in a deed to secure debt. O.C.G.A. § 24-2-114.

81.     Defendant SPS is a sophisticated mortgage loan servicer and among the largest servicers of residential mortgages.

82.     Defendant SPS is well aware of the laws regarding foreclosure in Georgia.

83.     Defendant by foreclosing Plaintiff's property without an enforceable legal interest demonstrates reckless disregard for the rights of the Plaintiff and a conscious indifference to the consequences of their actions.

84.     As a direct and proximate result of the conduct of Defendant SPS and BNY, the Plaintiff suffered great mental anguish, humiliation, concern, worry, and wounded feelings.

85.     As a direct and proximate result of the conduct of Defendant SPS and BNY, the Plaintiff suffered pecuniary loss in the expenditure for attorney's fees, expert fees and associated costs and expenses.

86.     As a direct and proximate result of the conduct of Defendant SPS, the Plaintiff has suffered pecuniary loss in the form of additional interest, fees and costs levied by SPS.

WHEREFORE, Plaintiff prays that:

A.  Plaintiff's mortgage be cancelled and rescinded;

B.  Defendants be enjoined from taking any further action in purported furtherance of the foreclosure and transfer of Plaintiff's property;

C.  Plaintiff be awarded the costs of this suit, including attorneys' fees; and

D.  This Court grants such further legal and equitable relief as is just.

### THIRD CAUSE OF ACTION – NEGLIGENT MORTGAGE SERVICING

87.     Plaintiff refers and incorporates by reference the Paragraphs 1 through 86 as if fully set forth herein.

88.     The Defendant SPS owed the Plaintiff a fiduciary duty to properly collect payments, distribute payments, debit the Plaintiff's account and credit the Plaintiff's account.

89.     Defendant SPS also owed to the Plaintiff a duty not to assess illegal, unauthorized or improper charges to service the mortgage of the Plaintiff in a commercially reasonable manner so as to not create a false default or a default not based in fact.

90.     SPS breached its duty to the Plaintiff by not properly crediting the Plaintiff's account or distributing the Plaintiff's payments appropriately and by applying to the Plaintiff's account charges which are illegal, unauthorized or improper and servicing the Plaintiff's loan in a manner that is commercially unreasonable and by creating a false default or exacerbating a default for the purposes of unjustly enriching the Defendants.

91.     The Defendant's breach was a proximate cause of injury and damage to the Plaintiffs, including emotional and financial injuries.

WHEREFORE, Plaintiff prays that:

A.  The Court take jurisdiction of this matter as an action *in rem* requiring the appointment of a special master pursuant to O.C.G.A. § 23-3-63;

B.  The Court appoint such special master and that this proceeding be referred to said special master by proper order pursuant to said code section;

C.  All issues of fact be tried by jury as provided in O.C.G.A. § 23-3-67;

D.  Plaintiff's mortgage be cancelled and rescinded and that Plaintiff has a judgment establishing title in the property in the estate against all the world and that all clouds upon the title to said land, including the purported deed from Plaintiff to Defendant be cancelled and removed;

E.  Defendants be enjoined from taking any further action in purported furtherance of the foreclosure and transfer of Plaintiff's property;

F.  That this Court order the Defendants have no legally recognizable interest in the property;

G.  That Defendants be enjoined from taking further action to foreclose, dispossess or evict Plaintiff from the property;

H.  That Plaintiff be awarded the costs of this suit, including attorneys' fees; and

I.  That this Court grant such further legal and equitable relief as is just.

Respectfully submitted, this 23rd day of May, 2019.

The Grimes Law Firm


/s/ KaRon Grimes
KaRon L. Grimes
5425 Peachtree Parkway, NW, #109
Peachtree Corners, Georgia 30092

Georgia Bar No. 782008
Telephone: (678) 232-6208
Facsimile:  (678) 264-0988
Jubileecounsel@gmail.com
*Attorney for Plaintiff*

# EXHIBIT

## "A"

 **Home Affordable Modification Program**

*Supplemental Directive 09-01*                              *April 6, 2009*

## Introduction of the Home Affordable Modification Program

### Background

On February 18, 2009, President Obama announced the Homeowner Affordability and Stability Plan to help up to 7 to 9 million families restructure or refinance their mortgages to avoid foreclosure. As part of this plan, the Treasury Department (Treasury) announced a national modification program aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels. On March 4, 2009, the Treasury issued uniform guidance for loan modifications across the mortgage industry. This Supplemental Directive provides additional guidance to servicers for adoption and implementation of the Home Affordable Modification program (HAMP) for mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages).

Under the HAMP, a servicer will use a uniform loan modification process to provide a borrower with sustainable monthly payments. The guidelines set forth in this document apply to all eligible mortgage loans secured by one- to four-unit owner-occupied single-family properties.

In order for a servicer to participate in the HAMP with respect to Non-GSE Mortgages, the servicer must execute a servicer participation agreement and related documents (Servicer Participation Agreement) with Fannie Mae in its capacity as financial agent for the United States (as designated by Treasury) on or before December 31, 2009. The Servicer Participation Agreement will govern servicer participation in the HAMP program for all Non-GSE Mortgages. Servicers of mortgage loans that are owned or guaranteed by Fannie Mae or Freddie Mac should refer to the HAMP announcement issued by the applicable GSE.

The HAMP reflects usual and customary industry standards for mortgage loan modifications contained in typical servicing agreements, including pooling and servicing agreements (PSAs) governing private label securitizations. As detailed in the Servicer Participation Agreement, participating servicers are required to consider <u>all</u> eligible mortgage loans unless prohibited by the rules of the applicable PSA and/or other investor servicing agreements. Participating servicers are required to use reasonable efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in order to carry out any modification under the HAMP.

To help servicers implement the HAMP, this Supplemental Directive covers the following topics:

- HAMP Eligibility
- Underwriting
- Modification Process
- Reporting Requirements
- Fees and Compensation
- Compliance

## HAMP Eligibility

A Non-GSE Mortgage is eligible for the HAMP if the servicer verifies that all of the following criteria are met:

- The mortgage loan is a first lien mortgage loan originated on or before January 1, 2009.
- The mortgage loan has not been previously modified under the HAMP.
- The mortgage loan is delinquent or default is reasonably foreseeable; loans currently in foreclosure are eligible.
- The mortgage loan is secured by a one- to four-unit property, one unit of which is the borrower's principal residence. Cooperative share mortgages and mortgage loans secured by condominium units are eligible for the HAMP. Loans secured by manufactured housing units are eligible for the HAMP.
- The property securing the mortgage loan must not be vacant or condemned.
- The borrower documents a financial hardship and represents that (s)he does not have sufficient liquid assets to make the monthly mortgage payments by completing a Home Affordable Modification Program Hardship Affidavit and provides the required income documentation. The documentation supporting income may not be more than 90 days old (as of the date the servicer is determining HAMP eligibility).
- The borrower has a monthly mortgage payment ratio of greater than 31 percent.
- A borrower in active litigation regarding the mortgage loan is eligible for the HAMP.
- The servicer may not require a borrower to waive legal rights as a condition of the HAMP.
- A borrower actively involved in a bankruptcy proceeding is eligible for the HAMP at the servicer's discretion. Borrowers who have received a Chapter 7 bankruptcy discharge in a case involving the first lien mortgage who did not reaffirm the mortgage debt under applicable law are eligible, provided the Home Affordable Modification Trial Period Plan and Home Affordable Modification Agreement are revised as outlined in the *Acceptable Revisions to HAMP Documents* section of this Supplemental Directive.
- The borrower agrees to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist.
- Borrowers may be accepted into the program if a fully executed Home Affordable Modification Trial Period Plan is in the servicer's possession on December 31, 2012.

- The current unpaid principal balance (UPB) of the mortgage loan prior to capitalization must be no greater than:
  - o  1 Unit: $729,750
  - o  2 Units: $934,200
  - o  3 Units: $1,129,250
  - o  4 Units: $1,403,400

Note:  Mortgage loans insured, guaranteed or held by a federal government agency (e.g., FHA, HUD, VA and Rural Development) may be eligible for the HAMP, subject to guidance issued by the relevant agency.  Further details regarding inclusion of these loans in the HAMP will be provided in a subsequent Supplemental Directive.

The HAMP documents are available through www.financialstability.gov.  Documents include the Home Affordable Modification Trial Period Plan (hereinafter referred to as Trial Period Plan), the Home Affordable Modification Agreement (hereinafter referred to as the Agreement), the Home Affordable Modification Program Hardship Affidavit (hereinafter referred to as the Hardship Affidavit) and various cover letters.

## Underwriting

## Hardship Affidavit

Every borrower and co-borrower seeking a modification, whether in default or not, must sign a Hardship Affidavit that attests to and describes one or more of the following types of hardship:

1. A reduction in or loss of income that was supporting the mortgage.
2. A change in household financial circumstances.
3. A recent or upcoming increase in the monthly mortgage payment.
4. An increase in other expenses.
5. A lack of sufficient cash reserves to maintain payment on the mortgage and cover basic living expenses at the same time.  Cash reserves include assets such as cash, savings, money market funds, marketable stocks or bonds (excluding retirement accounts and assets that serve as emergency fund – generally equal to three times the borrower's monthly debt payments).
6. Excessive monthly debt payments and overextension with creditors, e.g., the borrower was required to use credit cards, a home equity loan, or other credit to make the mortgage payment.
7. Other reasons for hardship detailed by the borrower.

Note:  The borrower is not required to have the Hardship Affidavit notarized.

## Reasonably Foreseeable (Imminent) Default

A borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, appears potentially eligible for a modification, and claims a hardship must

be screened for imminent default. The servicer must make a determination as to whether a payment default is imminent based on the servicer's standards for imminent default and consistent with applicable contractual agreements and accounting standards. If the servicer determines that default is imminent, the servicer must apply the Net Present Value test.

In the process of making its imminent default determination, the servicer must evaluate the borrower's financial condition in light of the borrower's hardship as well as inquire as to the condition of and circumstances affecting the property securing the mortgage loan. The servicer must consider the borrower's financial condition, liquid assets, liabilities, combined monthly income from wages and all other identified sources of income, monthly obligations (including personal debts, revolving accounts, and installment loans), and a reasonable allowance for living expenses such as food, utilities, etc. The hardship and financial condition of the borrower shall be verified through documentation.

### *Documenting the Reason for and Timing of Imminent Default*

A servicer must document in its servicing system the basis for its determination that a payment default is imminent and retain all documentation used to reach its conclusion. The servicer's documentation must also include information on the borrower's financial condition as well as the condition and circumstances of the property securing the mortgage loan.

## Net Present Value (NPV) Test

All loans that meet the HAMP eligibility criteria and are either deemed to be in imminent default (as described above) or 60 or more days delinquent must be evaluated using a standardized NPV test that compares the NPV result for a modification to the NPV result for no modification. If the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed "positive" and the servicer MUST offer the modification. If the NPV result for no modification is greater than NPV result for the modification scenario, the modification result is deemed "negative" and the servicer has the option of performing the modification in its discretion. For mortgages serviced on behalf of a third party investor for which the modification result is deemed "negative," however, the servicer may not perform the modification without express permission of the investor. If a modification is not pursued when the NPV result is "negative," the servicer must consider the borrower for other foreclosure prevention options, including alternative modification programs, deeds-in-lieu, and preforeclosure sale programs.

Whether or not a modification is pursued, the servicer MUST maintain detailed documentation of the NPV model used, all NPV inputs and assumptions and the NPV results.

Fannie Mae has developed a software application for servicers to submit loan files to the NPV calculator. The software application is available on the Home Affordable

Modification servicer web portal accessible through www.financialstability.gov. On this portal, servicers will have access to the NPV calculator tool as well as detailed guidelines for submitting proposed modification data.

Servicers having at least a $40 billion servicing book will have the option to create a version of the NPV calculator that uses a set of cure rates and redefault rates estimated based on the experience of their own portfolios, taking into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status and other loan or borrower attributes.  Detailed guidance on required inputs for custom NPV calculations is forthcoming.

For mortgages serviced on behalf of a third party investor, the servicer must use a discount rate at least as high as the rate used on the servicer's own portfolio, but in no event higher than the maximum rate permitted under the HAMP.

To obtain a property valuation input for the NPV calculator, servicers may use either an automated valuation model (AVM), provided that the AVM renders a reliable confidence score, or a broker's price opinion (BPO).  A servicer may use an AVM provided by one of the GSEs.  As an alternative, servicers may rely on their internal AVM provided that:

(i) the servicer is subject to supervision by a Federal regulatory agency;
(ii) the servicer's primary Federal regulatory agency has reviewed the model; and
(iii) the AVM renders a reliable confidence score.

If a GSE AVM or the servicer AVM is unable to render a value with a reliable confidence score, the servicer must obtain an assessment of the property value utilizing a BPO or a property valuation method acceptable to the servicer's Federal regulatory supervisor.  Such assessment must be rendered in accordance with the Interagency Appraisal and Evaluation Guidelines (as if such guidelines apply to loan modifications). In all cases, the property valuation used cannot be more than 90 days old.

## Verifying Borrower Income and Occupancy Status

Servicers may use recent verbal financial information obtained from the borrower and any co-borrower 90 days or less from the date the servicer is determining HAMP eligibility to assess the borrower's eligibility.  The servicer may rely on this information to prepare and send to the borrower a solicitation for the HAMP and an offer of a Trial Period Plan.  When the borrower returns the Trial Period Plan and related documents, the servicer must review them to verify the borrower's financial information and eligibility – except that documentation of income may not be more than 90 days old as of the determination of eligibility.

As an alternative, a servicer may require a borrower to submit the required documentation to verify the borrower's eligibility and income prior to preparing a Trial Period Plan.  Upon receipt of the documentation and determination of the borrower's

eligibility, a servicer may prepare and send to the borrower a letter indicating that the borrower is eligible for the HAMP together with a Trial Period Plan.

The borrower will only qualify for the HAMP if the verified income documentation confirms that the monthly mortgage payment ratio prior to the modification is greater than 31 percent. The "monthly mortgage payment ratio" is the ratio of the borrower's current monthly mortgage payment to the borrower's monthly gross income (or the borrowers' combined monthly gross income in the case of co-borrowers). The "monthly mortgage payment" includes the monthly payment of principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees, as applicable (including any escrow payment shortage amounts subject to a repayment plan). When determining a borrower's monthly mortgage payment ratio, servicers must adjust the borrower's current mortgage payment to include, as applicable, property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees if these expenses are not already included in the borrower's payment. The monthly mortgage payment does not include mortgage insurance premium payments or payments due to holders of subordinate liens.

With respect to adjustable rate loans where there is a rate reset scheduled within 120 days after the date of the evaluation (a "Reset ARM"), the monthly mortgage payment used to determine eligibility will be the greater of (i) the borrower's current scheduled monthly mortgage payment or (ii) a fully amortizing monthly mortgage payment based on the note reset rate using the index value as of the date of the evaluation (the "Reset Interest Rate"). With respect to adjustable rate loans that reset more than 120 days after the date of the evaluation, the borrower's current scheduled monthly mortgage payment will be used to determine eligibility.

The borrower's "monthly gross income" is the borrower's income amount before any payroll deductions and includes wages and salaries, overtime pay, commissions, fees, tips, bonuses, housing allowances, other compensation for personal services, Social Security payments, including Social Security received by adults on behalf of minors or by minors intended for their own support, and monthly income from annuities, insurance policies, retirement funds, pensions, disability or death benefits, unemployment benefits, rental income and other income. If only net income is available, the servicer must multiply the net income amount by 1.25 to estimate the monthly gross income.

Servicers should include non-borrower household income in monthly gross income if it is voluntarily provided by the borrower and if there is documentary evidence that the income has been, and reasonably can continue to be, relied upon to support the mortgage payment. All non-borrower household income included in monthly gross income must be documented and verified by the servicer using the same standards for verifying a borrower's income.

The servicer may not require a borrower to make an up-front cash contribution (other than the first trial period payment) for the borrower to be considered for the HAMP.

The HAMP documents instruct the borrower (the term "borrower" includes any co-borrower) to provide the following financial information to the servicer:

If the borrower is employed:
- A signed copy of the most recently filed federal income tax return, including all schedules and forms, if available,
- A signed IRS Form 4506-T (Request for Transcript of Tax Return), and
- Copies of the two most recent paystubs indicating year-to-date earnings.
- For additional income such as bonuses, commissions, fees, housing allowances, tips and overtime, a servicer must obtain a letter from the employer or other reliable third-party documentation indicating that the income will in all probability continue.

If the borrower is self-employed:
- A signed copy of the most recent federal income tax return, including all schedules and forms, if available,
- A signed IRS Form 4506-T (Request for Transcript of Tax Return), and
- The most recent quarterly or year-to-date profit and loss statement for each self-employed borrower.
- Other reliable third-party documentation the borrower voluntarily provides.

Note: For both a salaried or a self-employed borrower, if the borrower does not provide a signed copy of the most recently filed federal income tax return, or if the Compliance Agent so requires, the servicer must submit the Form 4506-T to the IRS to request a transcript of the return.

If the borrower elects to use alimony or child support income to qualify, acceptable documentation includes:
- Photocopies of the divorce decree, separation agreement, or other type of legal written agreement or court decree that provides for the payment of alimony or child support and states the amount of the award and the period of time over which it will be received. Servicers must determine that the income will continue for at least three years.
- Documents supplying reasonably reliable evidence of full, regular and timely payments, such as deposit slips, bank statements or signed federal income tax returns.

If the borrower has other income such as social security, disability or death benefits, or a pension:
- Acceptable documentation includes letters, exhibits, a disability policy or benefits statement from the provider that states the amount, frequency, and duration of the benefit. The servicer must determine that the income will continue for at least three years.
- The servicer must obtain copies of signed federal income tax returns, IRS W-2 forms, or copies of the two most recent bank statements.

If the borrower receives public assistance or collects unemployment:
- Acceptable documentation includes letters, exhibits or a benefits statement from the provider that states the amount, frequency, and duration of the benefit. The servicer must determine that the income will continue for at least nine months.

If the borrower has rental income, acceptable documentation includes:
- Copies of all pages from the borrower's most recent two years of signed federal income tax returns and Schedule E – Supplemental Income and Loss. The monthly net rental income to be calculated for HAMP purposes equals 75 percent of the gross rent, with the remaining 25 percent considered vacancy loss and maintenance expense.

A servicer must confirm that the property securing the mortgage loan is the borrower's primary residence as evidenced by the most recent signed federal income tax return (or transcript of tax return obtained from the IRS), a credit report and one other form of documentation that would supply reasonable evidence that the property is the borrower's primary residence (such as utility bills in the borrower's name).

A servicer is not required to modify a mortgage loan if there is reasonable evidence indicating the borrower submitted false or misleading information or otherwise engaged in fraud in connection with the modification.

## Standard Modification Waterfall

Servicers are required to consider a borrower for a refinance through the Hope for Homeowners program when feasible. Consideration for a Hope for Homeowners refinance should not delay eligible borrowers from receiving a modification offer and beginning the trial period. Servicers must use the modification options listed below to begin the HAMP modification and work to complete the Hope for Homeowners refinance during the trial period.

Servicers must apply the modification steps enumerated below in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent, without going below 31 percent (the "target monthly mortgage payment ratio"). If the applicable PSA or other investor servicing agreement prohibits the servicer from taking a modification step, the servicer may seek approval for an exception.

Servicers are not precluded under the HAMP from agreeing to a modification that reduces the borrower's monthly mortgage payment ratio below 31% as long as the modification otherwise complies with the HAMP requirements. Similarly and where otherwise permitted by the applicable PSA or other investor servicing contract, servicers are not precluded under the HAMP from agreeing to a modification where the interest rate does not step up after five years, or where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31%, so long as the modification otherwise complies with HAMP

requirements. However, borrower, servicer and investor incentive payments for these modifications will be paid based on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

**Note:** If a borrower has an adjustable-rate mortgage (ARM) or interest-only mortgage, the existing interest rate will convert to a fixed interest rate, fully amortizing loan.

**Step 1:** Capitalize accrued interest, out-of-pocket escrow advances to third parties, and any required escrow advances that will be paid to third parties by the servicer during the trial period and servicing advances (costs and expenses incurred in performing its servicing obligation, such as those related to preservation and protection of the security property and the enforcement of the mortgage) paid to third parties in the ordinary course of business and not retained by the servicer, if allowed by state law. The servicer should capitalize only those third party delinquency fees that are reasonable and necessary. Fees permitted by Fannie Mae and Freddie Mac for GSE loans shall be considered evidence of fees that would be reasonable for non-GSE loans. Late fees may not be capitalized and must be waived if the borrower satisfies all conditions of the Trial Period Plan.

**Step 2:** Reduce the interest rate. If the loan is a fixed rate mortgage or an adjustable-rate mortgage, then the starting interest rate is the current interest. If the loan is a Reset ARM, the starting interest rate is the Reset Interest Rate.

Reduce the starting interest rate in increments of .125 percent to get as close as possible to the target monthly mortgage payment ratio. The interest rate floor in all cases is 2.0 percent.

- If the resulting rate is below the Interest Rate Cap, this reduced rate will be in effect for the first five years followed by annual increases of one percent per year (or such lesser amount as may be needed) until the interest rate reaches the Interest Rate Cap, at which time it will be fixed for the remaining loan term.
- If the resulting rate exceeds the Interest Rate Cap, then that rate is the permanent rate.

The "Interest Rate Cap" is the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, as of the date that the Agreement is prepared.

**Step 3:** If necessary, extend the term and reamortize the mortgage loan by up to 480 months from the modification effective date (i.e., the first day of the month following the end of the trial period) to achieve the target monthly mortgage payment ratio. If a term extension is not permitted under the applicable PSA or other investor servicing agreement, reamortize the mortgage loan based upon an amortization schedule of up to 480 months with a balloon payment due at maturity. Negative amortization after the effective date of the modification is prohibited.

**Step 4:** If necessary, the servicer must provide for principal forbearance to achieve the target monthly mortgage payment ratio. The principal forbearance amount is non-interest

bearing and non-amortizing. The amount of principal forbearance will result in a balloon payment fully due and payable upon the earliest of the borrower's transfer of the property, payoff of the interest bearing unpaid principal balance, or maturity of the mortgage loan. The modified interest bearing balance (i.e., the unpaid principal balance excluding the deferred principal balloon amount) must create a current mark-to-market LTV (current LTV based upon the new valuation) greater than or equal to 100 percent if the result of the NPV test is negative and the servicer elects to perform the modification.

There is no requirement to forgive principal under the HAMP. However, servicers may forgive principal to achieve the target monthly mortgage payment ratio on a standalone basis or before any step in the standard waterfall process set forth above. If principal is forgiven, subsequent steps in the standard waterfall may not be skipped. If principal is forgiven and the interest rate is not reduced, the existing rate will be fixed and treated as the modified rate for the purposes of the Interest Rate Cap.

## Verifying Monthly Gross Expenses

A servicer must obtain a credit report for each borrower or a joint report for a married couple who are co-borrowers to validate installment debt and other liens. In addition, a servicer must consider information concerning monthly obligations obtained from the borrower either orally or in writing. The "monthly gross expenses" equal the sum of the following monthly charges:

- The monthly mortgage payment, taxes, property insurance, homeowner's or condominium association fee payments and assessments related to the property whether or not they are included in the mortgage payment.
- Any mortgage insurance premiums.
- Monthly payments on all closed-end subordinate mortgages.
- Payments on all installment debts with more than ten months of payments remaining, including debts that are in a period of either deferment or forbearance. When payments on an installment debt are not on the credit report or are listed as deferred, the servicer must obtain documentation to support the payment amount included in the monthly debt payment. If no monthly payment is reported on a student loan that is deferred or is in forbearance, the servicer must obtain documentation verifying the proposed monthly payment amount, or use a minimum of 1.5 percent of the balance.
- Monthly payment on revolving or open-end accounts, regardless of the balance. In the absence of a stated payment, the payment will be calculated by multiplying the outstanding balance by 3 percent.
- Monthly payment on a Home Equity Line of Credit (HELOC) must be included in the payment ratio using the minimum monthly payment reported on the credit report. If the HELOC has a balance but no monthly payment is reported, the servicer must obtain documentation verifying the payment amount, or use a minimum of one percent of the balance.
- Alimony, child support and separate maintenance payments with more than ten months of payments remaining, if supplied by the borrower.

- Car lease payments, regardless of the number of payments remaining.
- Aggregate negative net rental income from all investment properties owned, if supplied by the borrower.
- Monthly mortgage payment for second home (principal, interest, taxes and insurance and, when applicable, leasehold payments, homeowner association dues, condominium unit or cooperative unit maintenance fees (excluding unit utility charges)).

## Total Monthly Debt Ratio

The borrower's total monthly debt ratio ("back-end ratio") is the ratio of the borrower's monthly gross expenses divided by the borrower's monthly gross income. Servicers will be required to send the Home Affordable Modification Program Counseling Letter to borrowers with a post-HAMP modification back-end ratio equal to or greater than 55 percent. The letter states the borrower must work with a HUD-approved housing counselor on a plan to reduce their total indebtedness below 55 percent. The letter also describes the availability and advantages of counseling and provides a list of local HUD-approved housing counseling agencies and directs the borrower to the appropriate HUD website where such information is located. The borrower must represent in writing in the HAMP documents that (s)he will obtain such counseling.

Face-to-face counseling is encouraged; however, telephone counseling is also permitted from HUD-approved housing counselors provided it covers the same topics as face-to-face sessions. Telephone counseling sessions provide flexibility to borrowers who are unable to attend face-to-face sessions or who do not have an eligible provider within their area.

A list of approved housing counseling agencies is available at http://www.hud.gov/offices/hsg/sfh/hcc/fc/ or by calling the toll-free housing counseling telephone referral service at 1-800-569-4287. A servicer must retain in its mortgage files evidence of the borrower notification. There is no charge to either borrowers or servicers for this counseling.

## Mortgages with No Due-on-Sale Provision

If a mortgage that is not subject to a due-on-sale provision receives an HAMP, the borrower agrees that the HAMP will cancel the assumability feature of that mortgage.

## Escrow Accounts

All of the borrower's monthly payments must include a monthly escrow amount unless prohibited by applicable law. The servicer must assume full responsibility for administering the borrower's escrow deposit account in accordance with the mortgage documents and all applicable laws and regulations. If the mortgage loan being considered for the HAMP is a non-escrowed mortgage loan, the servicer must establish an escrow deposit account prior to the beginning of the trial period. Servicers who do not

have this capacity must implement an escrow process within six months of signing the Servicer Participation Agreement. However, the servicer must ensure that the trial payments include escrow amounts and must place the escrow funds into a separate account identified for escrow deposits.

Servicers are encouraged to perform an escrow analysis prior to establishing the trial period payment. When performing an escrow analysis, servicers should take into consideration tax and insurance premiums that may come due during the trial period. When the borrower's escrow account does not have sufficient funds to cover an expense and the servicer advances the funds necessary to pay an expense to a third party, the amount of the servicer advance that is paid to a third party may be capitalized.

In the event the initial escrow analysis identifies a shortage – a deficiency in the escrow deposits needed to pay all future tax and insurance payments – the servicer must take steps to eliminate the shortage. Any actions taken by the servicer to eliminate the escrow shortage must be in compliance with applicable laws, rules and regulations, including, but not limited to, the Real Estate Settlement Procedures Act and the Truth in Lending Act.

## Compliance with Applicable Laws

Each servicer (and any subservicer it uses) must be aware of, and in full compliance with, all federal, state, and local laws (including statutes, regulations, ordinances, administrative rules and orders that have the effect of law, and judicial rulings and opinions) – including, but not limited to, the following laws that apply to any of its practices related to the HAMP:

- Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive acts or practices.
- The Equal Credit Opportunity Act and the Fair Housing Act, which prohibit discrimination on a prohibited basis in connection with mortgage transactions. Loan modification programs are subject to the fair lending laws, and servicers and lenders should ensure that they do not treat a borrower less favorably than other borrowers on grounds such as race, religion, national origin, sex, marital or familial status, age, handicap, or receipt of public assistance income in connection with any loan modification. These laws also prohibit redlining.
- The Real Estate Settlement Procedures Act, which imposes certain disclosure requirements and restrictions relating to transfers of the servicing of certain loans and escrow accounts.
- The Fair Debt Collection Practices Act, which restricts certain abusive debt collection practices by collectors of debts, other than the creditor, owed or due to another.

## Modification Process

### Borrower Solicitation

Servicers should follow their existing practices, including complying with any express contractual restrictions, with respect to solicitation of borrowers for modifications.

A servicer may receive calls from current or delinquent borrowers directly inquiring about the availability of the HAMP. In that case, the servicer should work with the borrower to obtain the borrower's financial and hardship information and to determine if the HAMP is appropriate. If the servicer concludes a current borrower is in danger of imminent default, the servicer must consider an HAMP modification.

When discussing the HAMP, the servicer should provide the borrower with information designed to help them understand the modification terms that are being offered and the modification process. Such communication should help minimize potential borrower confusion, foster good customer relations, and improve legal compliance and reduce other risks in connection with the transaction. A servicer also must provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions. The servicer should inform the borrower during discussions that the successful completion of a modification under the HAMP will cancel any assumption feature, variable or step-rate feature, or enhanced payment options in the borrower's existing loan, at the time the loan is modified.

Servicers must have adequate staffing, resources, and facilities for receiving and processing the HAMP documents and any requested information that is submitted by borrowers. Servicers must also have procedures and systems in place to be able to respond to inquiries and complaints about the HAMP. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution.

### Document Retention

Servicers must retain all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations, NPV calculations (assumptions, inputs and outputs), evidence of application of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up. The servicers must retain all documents and information related to the monthly payments during and after the trial period, as well as incentive payment calculations and such other required documents.

Servicers must retain detailed records of borrower solicitations or borrower-initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and specific justification with supporting details if the request for modification

under the HAMP was denied.  Records must also be retained to document the reason(s) for a trial modification failure. If an HAMP modification is not pursued when the NPV result is "negative," the servicer must document its consideration of other foreclosure prevention options.  If a borrower under an HAMP modification loses good standing, the servicer must retain documentation of its consideration of the borrower for other loss mitigation alternatives.

Servicers must retain required documents for a period of seven years from the date of the document collection.

## Temporary Suspension of Foreclosure Proceedings

To ensure that a borrower currently at risk of foreclosure has the opportunity to apply for the HAMP, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program and, if eligible, an offer to participate in the HAMP has been made.  Servicers must use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for the HAMP, including in-person contacts at the servicer's discretion.  Servicers must not conduct foreclosure sales on loans previously referred to foreclosure or refer new loans to foreclosure during the 30-day period that the borrower has to submit documents evidencing an intent to accept the Trial Period Plan offer. Except as noted herein, any foreclosure sale will be suspended for the duration of the Trial Period Plan, including any period of time between the borrower's execution of the Trial Period Plan and the Trial Period Plan effective date.

However, borrowers in Georgia, Hawaii, Missouri, and Virginia will be considered to have failed the trial period if they are not current under the terms of the Trial Period Plan as of the date that the foreclosure sale is scheduled.  Accordingly, servicers of HAMP loans secured by properties in these states may proceed with the foreclosure sale if the borrower has not made the trial period payments required to be made through the end of the month preceding the month in which the foreclosure sale is scheduled to occur.

## Mortgage Insurer Approval

If applicable, a servicer must obtain mortgage insurer approval for HAMP modifications. Servicers should consult their mortgage insurance providers for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with mortgage loans modified under the HAMP.

## Executing the HAMP Documents

Servicers must use a two-step process for HAMP modifications.  Step one involves providing a Trial Period Plan outlining the terms of the trial period, and step two involves providing the borrower with an Agreement that outlines the terms of the final modification.

In step one, the servicer should instruct the borrower to return the signed Trial Period Plan, together with a signed Hardship Affidavit and income verification documents (if not previously obtained from the borrower), and the first trial period payment (when not using automated drafting arrangements), to the servicer within 30 calendar days after the Trial Period Plan is sent by the servicer. The servicer is encouraged to contact the borrower before the expiration of the 30-day period if the borrower has not yet responded to encourage submission of the material. The servicer may, in its discretion, consider the offer of a Trial Period Plan to have expired at the end of 60 days if the borrower has not submitted both an executed Trial Period Plan and complete documentation as required under the Trial Period Plan. If the borrower's submission is incomplete, the servicer should work with the borrower to complete the Trial Period Plan submission. Note: The borrower is not required to have the Hardship Affidavit notarized.

Upon receipt of the Trial Period Plan from the borrower, the servicer must confirm that the borrower meets the underwriting and eligibility criteria. Once the servicer makes this determination and has received good funds for the first month's trial funds, the servicer should sign and immediately return an executed copy of the Trial Period Plan to the borrower. Payments made by the borrower under the terms of the Trial Period Plan will count toward successful completion irrespective of the date of the executed copy of the Trial Period Plan.

If the servicer determines that the borrower does not meet the underwriting and eligibility standards of the HAMP after the borrower has submitted a signed Trial Period Plan to the servicer, the servicer should promptly communicate that determination to the borrower in writing and consider the borrower for another foreclosure prevention alternative.

In step two, servicers must calculate the terms of the modification using verified income, taking into consideration amounts to be capitalized during the trial period. Servicers are encouraged to wait to send the Agreement to the borrower for execution until after receipt of the second to the last payment under the trial period. Note: the borrower is not required to have the Agreement notarized.

Servicers are reminded that all HAMP documentation must be signed by an authorized representative of the servicer and reflect the actual date of signature by the servicer's representative.

### Acceptable Revisions to HAMP Documents

Servicers are strongly encouraged to use the HAMP documents available through www.financialstability.gov. Should a servicer decide to revise the HAMP documents or draft its own HAMP documents, it must obtain prior written approval from Treasury or Fannie Mae with the exception of the following circumstances:

- The servicer must revise the HAMP documents as necessary to comply with Federal, State and local law. For example, in the event that the HAMP results in a

principal forbearance, servicers are obligated to modify the uniform instrument to comply with laws and regulations governing balloon disclosures.

- The servicer may include, as necessary, conditional language in HAMP offers and modification agreements indicating that the HAMP will not be implemented unless the servicer receives an acceptable title endorsement, or similar title insurance product, or subordination agreements from other existing lien holders, as necessary, to ensure that the modified mortgage loan retains its first lien position and is fully enforceable.

- If the borrower previously received a Chapter 7 bankruptcy discharge but did not reaffirm the mortgage debt under applicable law, the following language must be inserted in Section 1 of the Trial Period Plan and Section 1 of the Agreement: "I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement."

- The servicer may include language in the HAMP cover letter providing instructions for borrowers who elect to use an automated payment method to make the trial period payments.

Unless a borrower or co-borrower is deceased or a borrower and a co-borrower are divorced, all parties who signed the original loan documents or their duly authorized representative(s) must execute the HAMP documents. If a borrower and a co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property is not required to execute the HAMP documents. Servicers may evaluate requests on a case-by-case basis when the borrower is unable to sign due to circumstances such as mental incapacity, military deployment, etc. Furthermore, a borrower may elect to add a new co-borrower.

### Use of Electronic Records

Electronic records for HAMP are acceptable as long as the electronic record complies with applicable law.

### Assignment to MERS

If the original mortgage loan was registered with Mortgage Electronic Registration Systems, Inc. (MERS) and the originator elected to name MERS as the original mortgagee of record, solely as nominee for the lender named in the security instrument and the note, the servicer MUST make the following changes to the Agreement:

(a) Insert a new definition under the "Property Address" definition on page 1, which reads as follows:

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for lender and lender's successors and assigns. MERS is the mortgagee under the Mortgage. MERS is organized and existing

under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.

(b) Add as section 4.I.:

That MERS holds only legal title to the interests granted by the borrower in the mortgage, but, if necessary to comply with law or custom, MERS (as nominee for lender and lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of lender including, but not limited to, releasing and canceling the mortgage loan.

(c) MERS must be added to the signature lines at the end of the Agreement, as follows:

_____
Mortgage Electronic Registration
Systems, Inc. – Nominee for Lender

The servicer may execute the Agreement on behalf of MERS and, if applicable, submit it for recordation.

## Trial Payment Period

Servicers may use recent verbal financial information to prepare and offer a Trial Period Plan. Servicers are not required to verify financial information prior to the effective date of the trial period. The servicer must service the mortgage loan during the trial period in the same manner as it would service a loan in forbearance.

The trial period is three months in duration (or longer if necessary to comply with applicable contractual obligations). The borrower must be current under the terms of the Trial Period Plan at the end of the trial period to receive a permanent loan modification. Current in this context is defined as the borrower having made all required trial period payments no later than 30 days from the date the final payment is due.

The effective date of the trial period will be set forth in the Trial Period Plan. In most cases, the effective date is the first day of the month following the servicer's mailing of the offer for the Trial Period Plan. The trial period extends for two (or more if necessary to comply with applicable contractual obligations) additional payments after the effective date.

Servicers are encouraged to require automated payment methods, such as automatic payment drafting. If automatic payment drafting is required, it must be used by all HAMP borrowers, unless a borrower opts out.

If the verified income evidenced by the borrower's documentation exceeds the initial income information used by the servicer to place the borrower in the trial period by more

than 25 percent, the borrower must be reevaluated based on the program eligibility and underwriting requirements. If this reevaluation determines that the borrower is still eligible, new documents must be prepared and the borrower must restart the trial period.

If the verified income evidenced by the borrower's documentation is less than the initial income information used by the servicer to place the borrower in the trial period, or if the verified income exceeds the initial income information by 25 percent or less, and the borrower is still eligible, then the trial period will not restart and the trial period payments will not change; provided, that verified income will be used to calculate the monthly mortgage payment under the Agreement. (If, based on verified income the result of the NPV test is "negative" for modification, the servicer is not obligated to perform the modification.) However, if the servicer determines the borrower is not eligible for the HAMP based on verified income, the servicer must notify the borrower of that determination and that any trial period payments made by the borrower will be applied to the mortgage loan in accordance with the borrower's current loan documents.

If a servicer has information that the borrower does not meet all of the eligibility criteria for the HAMP (e.g., because the borrower has moved out of the house) the servicer should explore other foreclosure prevention alternatives prior to resuming or initiating foreclosure.

Note that under the terms of the Agreement, trial payments should be applied when they equal a full contractual payment (determined as of the time the HAMP is offered).

If the borrower complies with the terms and conditions of the Trial Period Plan, the loan modification will become effective on the first day of the month following the trial period as specified in the Trial Period Plan. However, because the monthly payment under the Agreement will be based on verified income documentation, the monthly payment due under the Agreement may differ from the payment amount due under the Trial Period Plan.

## Use of Suspense Accounts and Application of Payments

If permitted by the applicable loan documents, servicers may accept and hold as "unapplied funds" (held in a T&I custodial account) amounts received which do not constitute a full monthly, contractual principal, interest, tax and insurance (PITI) payment. However, when the total of the reduced payments held as "unapplied funds" is equal to a full PITI payment, the servicer is required to apply all full payments to the mortgage loan.

Any unapplied funds remaining at the end of the trial payment period that do not constitute a full monthly, contractual principal, interest, tax and insurance payment should be applied to reduce any amounts that would otherwise be capitalized onto the principal balance.

If a principal curtailment is received on a loan that has a principal forbearance, servicers are instructed to apply the principal curtailment to the interest bearing UPB. If, however, the principal curtailment amount is greater than or equal to the interest bearing UPB, then the curtailment should be applied to the principal forbearance portion. If the curtailment satisfies the principal forbearance portion, any remaining funds should then be applied to the interest bearing UPB.

## Recording the Modification

For all mortgage loans that are modified pursuant to the HAMP, the servicer must follow investor guidance with respect to ensuring that the modified mortgage loan retains its first lien position and is fully enforceable.

## Monthly Statements

For modifications that include principal forbearance, servicers are encouraged to include the amount of the gross UPB on the borrower's monthly payment statement. In addition, the borrower should receive information on a monthly basis regarding the accrual of "pay for performance" principal balance reduction payments.

## Redefault and Loss of Good Standing

If, following a successful trial period, a borrower defaults on a loan modification executed under the HAMP (three monthly payments are due and unpaid on the last day of the third month), the loan is no longer considered to be in "good standing." Once lost, good standing cannot be restored even if the borrower subsequently cures the default. A loan that is not in good standing is not eligible to receive borrower, servicer or investor incentives and reimbursements and these payments will no longer accrue for that mortgage. Further, the mortgage is not eligible for another HAMP modification.

In the event a borrower defaults, the servicer must work with the borrower to cure the modified loan, or if that is not feasible, evaluate the borrower for any other available loss mitigation alternatives prior to commencing foreclosure proceedings. The servicer must retain documentation of its consideration of the borrower for other loss mitigation alternatives.

## Reporting Requirements

Each servicer will be required to register with Fannie Mae to participate in the HAMP. Fannie Mae will provide an HAMP Registration form to facilitate registration.

Additionally, servicers will be required to provide periodic HAMP loan level data to Fannie Mae. The data must be accurate, complete, and in agreement with the servicer's records. Data should be reported by a servicer at the start of the modification trial period and during the modification trial period, for loan set up of the approved modification, and

monthly after the modification is set up on Fannie Mae's system. Servicers will be required to submit three separate data files as described below.

Note: The following data files can be delivered through a data collection tool on the servicer web portal available through www.financialstability.gov. Detailed guidelines for submitting data files are available at the servicer web portal. For those servicers who cannot use this process, an alternate process to submit data via a spreadsheet will be made available. More information on the alternative process for submitting data in a spreadsheet will be provided in the future.

### *Trial Period*

Servicers will be required to provide loan level data in order to establish loans for processing during the HAMP trial period. See Exhibit A for trial period set up attributes.

In addition, servicers will be required to report activity during the HAMP trial period in order to substantiate the receipt of proceeds during the trial period and to record modification details. See Exhibit B for trial period reporting attributes.

### *Loan Setup*

A one time loan set up is required to establish the approved modified HAMP loan on Fannie Mae's system. The file layout is the same that is used for establishing loans for processing during the trial period. See Exhibit A for loan set up attributes.

Servicers are required to provide the set up file the business day after the modification closes. The set up file should reflect the status of the loan after the final trial period payment is applied. The set up file will contain data for the current reporting period (e.g., prior month balances).

### *Monthly Loan Activity Reporting*

The month after the loan set up file is provided, servicers must begin reporting activity on all HAMP loans on a monthly basis (e.g., loan set up file provided in July, the first loan activity report is due in August for July activity). See Exhibit C for monthly reporting attributes.

The HAMP loan activity report (LAR) is due by the 4th business day each month. Servicers will have until the 15th calendar day of each month to clear up any edits and have a final LAR reported to Fannie Mae. The Fannie Mae system will validate that the borrower payment has been made as expected and that the last paid installment (LPI) date is current before accruing the appropriate monthly compensation due.

If a loan becomes past due (the LPI date does not advance), the monthly compensation on that loan will not be accrued. If the loan is brought current, compensation will not be caught up (e.g., if a loan was two months past due, and then the borrower makes the

payments and brings the loan current, the annual compensation provided would be for ten months. The two months of compensation associated with the period of delinquency is not recoverable).

### Additional Data Requirements

Additional data elements must be collected and reported as specified in Exhibit D. Some of these elements must be collected for all completed modifications regardless of the date of completion; guidance for collecting these elements will be forthcoming shortly. The requirement to collect these elements for trial modifications and for loans evaluated for a modification will be phased in as specified in Exhibit D.

## Reporting to Mortgage Insurers

Servicers must maintain their mortgage insurance processes and comply with all reporting required by the mortgage insurer for loans modified under the HAMP. Servicers should consult with the mortgage insurer for specific processes related to the reporting of modified terms, payment of premiums, payment of claims, and other operational matters in connection with mortgage loans modified under the HAMP.

Servicers are required to report successful HAMP modifications and the terms of those modifications to the appropriate mortgage insurers, if applicable, within 30 days following the end of the trial period and in accordance with procedures that currently exist or may be agreed to between servicers and the mortgage insurers.

Servicers must include the mortgage insurance premium in the borrower's modified payment, and must ensure that any existing mortgage insurance is maintained. Among other things, the servicer must ensure that the mortgage insurance premium is paid. In addition, servicers must adapt their systems to ensure proper reporting of modified loan terms and avoid impairing coverage for any existing mortgage insurance. For example, in the event that the modification includes principal forbearance, servicers must continue to pay the correct mortgage insurance premiums based on the gross UPB, including any principal forbearance amount, must include the gross UPB in their delinquency reporting to the mortgage insurer, and must ensure any principal forbearance does not erroneously trigger automatic mortgage insurance cancellation or termination.

## Transfers of Servicing

When a transfer of servicing includes mortgages modified under the HAMP, the transferor servicer must provide special notification to the transferee servicer. Specifically, the transferor servicer must advise the transferee servicer that loans modified under the HAMP are part of the portfolio being transferred and must confirm that the transferee servicer is aware of the special requirements for these loans, and agrees to assume the additional responsibilities associated with servicing them. A required form of assignment and assumption agreement must be used and is a part of the Servicer Participation Agreement.

### Credit Bureau Reporting

The servicer should continue to report a "full-file" status report to the four major credit repositories for each loan under the HAMP in accordance with the Fair Credit Reporting Act and credit bureau requirements as provided by the Consumer Data Industry Association (the "CDIA") on the basis of the following: (i) for borrowers who are current when they enter the trial period, the servicer should report the borrower current but on a modified payment if the borrower makes timely payments by the 30th day of each trial period month at the modified amount during the trial period, as well as report the modification when completed, and (ii) for borrowers who are delinquent when they enter the trial period, the servicer should continue to report in such a manner that accurately reflects the borrower's delinquency and workout status following usual and customary reporting standards, as well as report the modification when completed. More detailed guidance on these reporting requirements will be published by the CDIA.

"Full-file" reporting means that the servicer must describe the exact status of each mortgage it is servicing as of the last business day of each month.

### Fees and Compensation

### Late Fees

All late charges, penalties, stop-payment fees, or similar fees must be waived upon successful completion of the trial period.

### Administrative Costs

Servicers may not charge the borrower to cover the administrative processing costs incurred in connection with a HAMP. The servicer must pay any actual out-of-pocket expenses such as any required notary fees, recordation fees, title costs, property valuation fees, credit report fees, or other allowable and documented expenses. Servicers will not be reimbursed for the cost of the credit report(s).

### Incentive Compensation

No incentives of any kind will be paid if (i) the servicer has not executed the Servicer Participation Agreement, or (ii) the borrower's monthly mortgage payment ratio starts below 31 percent prior to the implementation of the HAMP. The calculation and payment of all incentive compensation will be based strictly on the borrower's verified income. Each servicer must promptly apply or remit, as applicable, all borrower and investor compensation it receives with respect to any modified loan.

With respect to payment of any incentive that is predicated on a six percent reduction in the borrower's monthly mortgage payment, the reduction will be calculated by comparing the monthly mortgage payment used to determine eligibility (adjusted as applicable to

include property taxes, hazard insurance, flood insurance, condominium association fees and homeowner's association fees) and the borrower's payment under HAMP.

The amount of funds available to pay servicer, borrower and investor compensation in connection with each servicer's modifications will be capped pursuant to each servicer's Servicer Participation Agreement (Program Participation Cap). Treasury will establish each servicer's initial Program Participation Cap by estimating the number of HAMP modifications expected to be performed by each servicer during the term of the HAMP. The Program Participation Cap could be adjusted based on Treasury's full book analysis of the servicer's loans.

The funds remaining available for a servicer's modifications under that servicer's Program Participation Cap will be reduced by the maximum amount of compensation payments potentially payable with respect to each loan modification upon entering into a trial period. In the event the compensation actually paid with respect to a loan modification is less than the maximum amount of compensation payments potentially payable, the funds remaining available for a servicer's modifications under the HAMP will be increased by the difference between such amounts.

Treasury may, from time to time and in its sole discretion, revise a servicer's Program Participation Cap. Fannie Mae will provide written notification to a servicer of all changes made to the servicer's Program Participation Cap. Once a servicer's Program Participation Cap is reached, a servicer must not enter into any agreements with borrowers intended to result in new loan modifications, and no payments will be made with respect to any new loan modifications.

### Servicer Incentive Compensation

A servicer will receive compensation of $1,000 for each completed modification under the HAMP. In addition, if a borrower was current under the original mortgage loan, a servicer will receive an additional compensation amount of $500. All such servicer incentive compensation shall be earned and payable once the borrower successfully completes the trial payment period, provided that the servicer has signed and delivered to Fannie Mae a Servicer Participation Agreement, any related documentation and any required servicer or loan set up data prior to the effective date of the loan modification.

If a particular borrower's monthly mortgage payment (principal, interest, taxes, all related property insurance and homeowner's or condominium association fees but excluding mortgage insurance) is reduced through the HAMP by six percent or more, a servicer will also receive an annual "pay for success" fee for a period of three years. The fee will be equal to the lesser of: (i) $1,000 ($83.33/month), or (ii) one-half of the reduction in the borrower's annualized monthly payment. The "pay for success" fee will be payable annually for each of the first three years after the anniversary of the month in which a Trial Period Plan was executed. If the loan ceases to be in good standing, the servicer will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency.

### *Borrower's Incentive Compensation*

To provide an additional incentive for borrowers to keep their modified loan current, borrowers whose monthly mortgage payment (principal, interest, taxes, all related property insurance and homeowner's or condominium association fees but excluding mortgage insurance) is reduced through the HAMP by six percent or more and who make timely monthly payments will earn an annual "pay for performance" principal balance reduction payment equal to the lesser of: (i) $1,000 ($83.33/month), or (ii) one-half of the reduction in the borrower's annualized monthly payment for each month a timely payment is made. A borrower can earn the right to receive a "pay for performance" principal balance reduction payment for payments made during the first five years following execution of the Agreement provided the loan continues to be in good standing as of the date the payment is made. The "pay for performance" principal balance reduction payment will accrue monthly but will be applied annually for each of the five years in which this incentive payment accrues, prior to the first payment due date after the anniversary of the month in which the Trial Period Plan was executed. This payment will be paid to the mortgage servicer to be applied first towards reducing the interest bearing UPB on the mortgage loan and then to any principal forbearance amount (if applicable). Any applicable prepayment penalties on partial principal prepayments made by the government must be waived. Borrower incentive payments do not accrue during the Trial Period; however, on the first month of the modification, the borrower will accrue incentive payments equal to the number of months in the trial period.

If and when the loan ceases to be in good standing, the borrower will cease to be eligible for any further incentive payments after that time, even if the borrower subsequently cures his or her delinquency. The borrower will lose his or her right to any accrued incentive compensation when the loan ceases to be in good standing.

### *Investor Payment Reduction Cost Share and Up Front Incentives*

If the target monthly mortgage payment ratio is achieved, investors in Non-GSE Mortgages are entitled to payment reduction cost share compensation. This compensation equals one-half of the dollar difference between the borrower's monthly payment under the modification at the target monthly mortgage payment ratio and the lesser of (i) what the borrower's monthly payment would be at a 38 percent monthly mortgage payment ratio; or (ii) the borrower's pre-modification monthly payment. Payment reduction cost share compensation shall accrue monthly as the borrower makes each payment so long as the loan is in good standing as defined in these guidelines. This compensation will be provided for up to five years or until the loan is paid off, whichever is earlier.

Additionally, investors will receive a one-time incentive of $1,500 for each Agreement executed with a borrower who was current prior to the start of the Trial Period Plan. The one-time incentive is conditional upon at least a six percent reduction in the borrower's monthly mortgage payment.

Neither the payment reduction share nor the up-front incentive shall be payable if the Trial Period Plan is not successfully completed.

## **Compliance**

Servicers must comply with the HAMP requirements and must document the execution of loan evaluation, loan modification and accounting processes. Servicers must develop and execute a quality assurance program that includes either a statistically based (with a 95 percent confidence level) or a ten percent stratified sample of loans modified, drawn within 30-45 days of final modification and reported on within 30-45 days of review. In addition, a trending analysis must be performed on a rolling 12-month basis.

Treasury has selected Freddie Mac to serve as its compliance agent for the HAMP. In its role as compliance agent, Freddie Mac will utilize Freddie Mac employees and contractors to conduct independent compliance assessments. In addition, loan level data will be reviewed for eligibility and fraud.

The scope of the assessments will include, among other things, an evaluation of documented evidence to confirm adherence (e.g., accuracy and timeliness) to HAMP requirements with respect to the following:

- Evaluation of Borrower and Property Eligibility
- Compliance with Underwriting Guidelines
- Execution of NPV/Waterfall processes
- Completion of Borrower Incentive Payments
- Investor Subsidy Calculations
- Data Integrity

The review will also evaluate the effectiveness of the servicer's quality assurance program; such evaluation will include, without limitation, the timing and size of the sample selection, the scope of the quality assurance reviews, and the reporting and remediation process.

There will be two types of compliance assessments: on-site and remote. Both on-site and remote reviews will consist of the following activities (among others): notification, scheduling, self assessments, documentation submission, interviews, file reviews, and reporting.

For on-site reviews, Freddie Mac will strive to provide the servicer with (i) a 30-day advance notification of a pending review and (ii) subsequent confirmation of the dates of the review. However, Freddie Mac reserves the right to arrive at the servicer's site unannounced. Freddie Mac will request the servicer to make available documentation, including, without limitation, policies and procedures, management reports, loan files and a risk control self assessment ready for review. Additionally, Freddie Mac may request additional loan files during the review. Interviews will usually be conducted in-person.

During the review window, Freddie Mac will review loan files and other requested documentation to evaluate compliance with HAMP terms.  Upon the completion of the review, Freddie Mac will conduct an exit interview with the servicer to discuss preliminary assessment results.

For remote reviews, Freddie Mac will request the servicer to send documentation, including, without limitation, policies and procedures, management reports, loan files and a risk control self assessment within 30 days of the request.  In addition, time will be scheduled for phone interviews, including a results summary call after the compliance review is completed to discuss preliminary results.

The targeted time frame for publishing the servicer assessment report is 30 days after the completion of the review.  Treasury will receive a copy of the report five business days prior to the release of the report to the servicer.

There will be an issue/resolution appeal process for servicer assessments.  Servicers will be able to submit concerns or disputes to an independent quality assurance team within Freddie Mac.

A draft rating and implication methodology for the compliance assessments will be published in a subsequent Supplemental Directive and servicer feedback will be solicited prior to the finalization of the methodology.

## Exhibit A:  HAMP Trial Modification and Official Modification Loan Setup Data Elements

The following data elements are necessary for the HAMP Loan Setup for Trial Modification and Official Modification transactions.

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| GSE Servicer Number | The Fannie Mae or Freddie Mac unique Servicer identifier. | Text (30) | | C | C |
| Servicer Loan Number | The unique (for the lender) identifier assigned to the loan by the lender that is servicing the loan. | Text (30) | | M | M |
| HAMP Servicer Number | A unique identifier assigned to each Servicer that is participating in the HAMP program. | Text (30) | | M | M |
| GSE Loan Number | A unique number assigned to each loan by a GSE (Fannie or Freddie) | Text (30) | | C | C |
| Underlying Trust Identifier | This is the CUSIP associated with the security.  A unique identification number assigned to a security by CUSIP (Committee on Uniform Security Identification Procedures) for trading. | Text (9) | | C | C |
| Program Type/ Campaign ID | A new program type that will identify campaign types.  The unique identifier of a Loan Workout Campaign. | Text (14) | HMP1 - HMP Delinquent, HMP2 - HMP Imminent Default HMP3 - Deed-in-lieu HMP4 - Deed-in-lieu with Jr. Lien HMP5 - Short Sale HMP6 - Short Sale With Jr. Lien | M | M |
| Investor Code | Owner of the mortgage. | Numeric (4,0) | 1 - Fannie Mae 2 - Freddie Mac 3 - Private 4 - Portfolio 5 - GNMA 6 - FHLMC | M | M |
| Borrower First Name | First Name of the Borrower of record | Text (100) | | M | M |
| Borrower Last Name | The last name of the Borrower.  This is also known as the family name or surname. | Text (100) | | M | M |
| Borrower Social Security Number | The Social Security Number of the borrower | Numeric (9) | | M | M |
| Co-Borrower First Name | First Name of the co-borrower of record | Text (100) | | C | C |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Co-Borrower Last Name | Last Name of the co- borrower of record | Text (100) | | C | C |
| Co-Borrower Social Security Number | The Social Security Number of the Co-Borrower | Numeric (9) | | O | O |
| Borrower Execution Date | This is the date that the borrower signs the initial documentation for a modification. | Date (CCYY-MM-DD) | | M | M |
| Submission Status | Status of loan data being submitted | Numeric (4,0) | 1-Trial 2-Borrower Disqualified 3-Official 4-Foreclosure Mitigation 5-Cancel | M | M |
| Date of Original Note | The date on which the original loan funding was dispersed to the borrower(s). | Date (CCYY-MM-DD) | | M | M |
| Unpaid Principal Balance before modification | The total principal amount outstanding as of the end of the month. The UPB should not reflect any accounting based write-downs and should only be reduced to zero when the loan has been liquidated – either paid-in-full, charged-off, REO sold or Service transferred (before modification) | Currency (20,2) | | M | M |
| Loan Mortgage Type Code | The code that specifies the type of mortgage being applied for or that has been granted. | Numeric (4,0) | 1 - FHA – Loans insured by the Federal Housing Administration 2 - VA – Loans insured by the Department of Veteran's Affairs, 3 - Conventional with PMI – Non-government insured mortgages insured by a private (non-government) insurer. 4 - Conventional w/o PMI – Mortgages with neither government nor private mortgage insurance. | M | M |
| Last Paid Installment Date before modification | The due date of the last paid installment of the loan. | Date (CCYY-MM-DD) | | M | M |
| First Lien Indicator | Indicates if loan is first lien. | Boolean | True/False | M | M |
| Foreclosure Referral Date | The date that the mortgage was referred to an attorney for the purpose of initiating foreclosure proceedings. This date should reflect the referral date of currently active foreclosure process. Loans cured from foreclosure should not have a referral date. | Date (CCYY-MM-DD) | | O | O |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Projected Foreclosure Sale Date | Projected date for foreclosure sale of subject property. | Date (CCYY-MM-DD) | | O | O |
| Hardship Reason Code | Identifies the reason for the borrower's hardship on their mortgage payment obligations. | Numeric (4,0) | 1 - Death of borrower, 2 - Illness of principal borrower, 3 - Illness of borrower family member, 4 - Death of borrower family member, 5 - Martial difficulties, 6 - Curtailment of income, 7 - Excessive obligation, 8 - Abandonment of property, 9 - Distant employment transfer, 10 - Property problem, 11 - Inability to sell property, 12 - Inability to rent property, 13 - Military service, 14 - Other, 15 - Unemployment, 16 - Business failure,17 - Casualty Loss, 18 - Energy environment costs, 19 - Servicing problems, 20 - Payment adjustment, 21 - Payment dispute, 22 - Transfer of ownership pending, 23 - Fraud, 24 - Unable to contact borrower,25 - Incarceration | M | M |
| Monthly Gross Income | Total monthly income in dollars for all borrowers on the loan. This is the gross income for all borrowers. | Currency (20,2) | | M | M |
| Monthly Debt Payments excluding PITIA | Total amount of monthly debt payments excluding Principal, Interest, Taxes, Insurance and Association Dues (PITIA) | Currency (20,2) | | M | M |
| NPV Date | Net Present Value – calculation date | Date (CCYY-MM-DD) | | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| NPV Model Result Amount Pre-Mod | Net Present Value amount generated from the model before modification | Currency (20,2) | | M | M |
| NPV Model Result Amount Post-Mod | Net Present Value amount generated from the model after modification | Currency (20,2) | | M | M |
| Amortization Term before modification | Represents the number of months on which installment payments are based. Example: Balloon loans have a seven year life (Loan Term = 84) but a 30 year amortization period (Amortization Term = 360). Installment payments are determined based on the 360 month term. | Numeric (4,0) | | M | M |
| Interest Rate before modification | The interest rate in the month prior to loan modification. Please report as rounded to nearest 8th. (e.g. 4.125) | Numeric (6,4) | | M | M |
| Principal and Interest Payment before modification | The scheduled principal and interest amount in the month prior to loan modification. | Currency (20,2) | | M | M |
| Escrow Payment before modification | The escrow amount in the month prior to loan modification. The amount of money that is collected from [added on to] the regular monthly mortgage payment to cover periodic payments of property taxes, private mortgage insurance and hazard insurance by the servicer on behalf of the mortgagee. Depending on the mortgage terms, this amount may or may not be collected. Generally, if the down payment is less than 20%, then these amounts are collected by the servicer. | Currency (20,2) | | C | C |
| Association Dues/ Fees before modification | Existing monthly payment for association dues/fees before modification | Currency (20,2) | | C | C |
| Principal Payment Owed or Not Reported | If borrower has contributed any cash or amounts in suspense | Currency (20,2) | | C | C |
| Other Contributions | If there are any amounts contributed by the borrower due to Hazard Claims | Currency (20,2) | | C | C |
| Attorney Fees Not in Escrow | Estimated legal fee not in escrow for advances capitalization and liquidation expense calculation | Currency (20,2) | | C | C |
| Escrow Shortage for Advances | Any Escrow advance amounts to be capitalized. | Currency (20,2) | | C | C |
| Other Advances | Other advances for advances capitalization other than escrow. Example: Attorney fees, Servicing Fees, etc. | Currency (20,2) | | C | C |
| Borrower Contributions | If the borrower is contributing any amounts, they must be reported here | Currency (20,2) | | C | C |
| Modified Loan Term – Officer Signature Date | Servicer sign off at the officer level for the loan modification. This is the date the servicer's officer approved the loan modification. This column will be populated for modification cases that need reclassification. There is no conversion needed for existing cases | Date (CCYY-MM-DD) | | C | C |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|------|-----------|-----------|------------------|-------------------------------------------------|---------------------------------------------|
| Disbursement Forgiven | If there are any Forgiven disbursement for advances capitalization | Currency (20,2) | | C | C |
| Monthly Housing Expense before modification | The dollar amount per month of the borrower's present housing expense .May be used for their primary or non-primary residence.  This must be Principal, Interest, Taxes, Insurance and Association Dues (PITIA). | Currency (20,2) | | M | M |
| Delinquent Interest | Delinquent interest for interest capitalization.  It is the amount of delinquent interest from the delinquent loan's LPI date to the workout execution date. | Currency (20,2) | | M | M |
| Interest Owed or Payment Not Reported | If there is Interest owed/received but not reported for interest capitalization, this field must be populated. | Currency (20,2) | | C | C |
| Servicing Fee Percent after modification | Percentage of servicing Fee after loan modification ( e.g. 0.25) | Numeric (4,2) | | M | M |
| Product before Modification | The mortgage product of the loan before the modification. | Numeric (4,0) | 1- ARM, 2 - Fixed Rate, 3 - Step Rate, 4 - One Step Variable, 5 - Two Step Variable, 6 - Three Step Variable, 7 - Four Step Variable, 8 - Five Step Variable,9 - Six Step Variable, 10 - Seven Step Variable,11 - Eight Step Variable, 12 - Nine Step Variable,13 - Ten Step Variable, 14 - Eleven Step Variable, 15 - Twelve Step Variable, 16 - Thirteen Step Variable, 17 - Fourteen | M | M |
| Maturity Date before Modification | The date on which the mortgage obligation is scheduled to be paid off, according to the mortgage note.  Maturity Date is commonly called Balloon Date for balloon loans, for which scheduled amortization does not pay off the balance of the loan, so that there is a final, large "balloon" payment at the end. | Date (CCYY-MM-DD) | | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Remaining Term before Modification | The number of months until the loan will be paid off, assuming that scheduled payments are made. This will equal lesser of 1. The number of months until the actual balance of the loan will amortize to zero; or 2. the number of months difference between the Loan Extended Term and the number of payments made by the borrower, where number of payments made by the borrower is derived by: Actual Last Paid Installment Date - First Installment Due Date - 1 (in months). | Numeric (4,0) | | M | M |
| Front Ratio before Modification | The refreshed Front-end DTI (Principal, Interest, Taxes, Insurance and Association Dues (PITIA)) housing ratio. | Numeric (4,2) | | M | M |
| Back Ratio before Modification | Percentage of borrower's PITIA plus debts to income ratio.  Borrower Total Debt To Income Ratio Percent.  The monthly expenses divided by the total monthly income for the Borrower. (e.g. 30.25) | Numeric (4,2) | | M | M |
| Principal and Interest Payment at 31% DTI | Principal and Interest payable for a 31% Debt to Income ratio | Currency (20,2) | | M | M |
| Principal and Interest Payment at 38% DTI | Principal and Interest payable for a 38% Debt to Income ratio | Currency (20,2) | | M | M |
| Property – Number of Units | Number of units in subject property (Valid values are 1, 2, 3 or 4) | Numeric (4,0) | | M | M |
| Property – Street Address | The street address of the subject property | Text (100) | | M | M |
| Property – City | The name of the city where the subject property is located | Text (100) | | M | M |
| Property – State | The 2-character postal abbreviation of the state, province, or region of the subject property. | Text (2) | | M | M |
| Property – Zip Code | The code designated by the postal service to direct the delivery of physical mail or which corresponds to a physical location. In the USA, this can take either a 5 digit form (ZIP Code) or a 9-digit form (ZIP + 4). | Text (9) | | M | M |
| Property Valuation - Method | Type of value analysis. | Numeric (4,0) | 1 - Full appraisal – Prepared by a certified appraiser; 2 - Limited appraisal – Prepared by a certified appraiser; 3 - Broker Price Opinion "BPO" – Prepared by a real estate broker or agent; 4 - Desktop Valuation – Prepared by bank employee; 5 - Automated Valuation Model | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| | | | "AVM" 6 - Automated Valuation Model " AVM" - Other | | |
| Property Valuation - Date | Date of the property value analysis | Date (CCYY-MM-DD) | | M | M |
| Property Valuation – As Is Value | Property as-is value determined by the property valuation | Currency (20,2) | | M | M |
| Property Condition Code | A code denoting the condition of the subject property. | Numeric (4,0) | 1 - Excellent 2 - Good, 3 - Fair 4 - Poor 5 - Condemned 6 - Inaccessible | M | M |
| Property Occupancy Status Code | A code identifying the occupancy by the borrower of the subject property. | Numeric (4,0) | 1- Vacant 2 - Borrower Occupied 3 - Tenant Occupied 4 – Unknown 5 - Occupied by Unknown | M | M |
| Property Usage Type Code | A code identifying the intended use by the borrower of the property. | Numeric (4,0) | 1 - Principal Residence 2 - Second or Vacation Home 3 - Investment Property | M | M |
| Modification Effective Date | The date on which the loan terms will be modified. | Date (CCYY-MM-DD) | | M | M |
| Product After Modification | The mortgage product of the loan, after the modification (Fixed or Step). | Numeric (4,0) | 1- ARM, 2 - Fixed Rate, 3 - Step Rate, 4 - One Step Variable, 5 - Two Step Variable, 6 - Three Step Variable, 7 - Four Step Variable, 8 - Five Step Variable,9 - Six Step Variable, 10 - Seven Step Variable,11 - Eight Step Variable, 12 - Nine Step Variable,13 - Ten Step Variable, 14 - Eleven Step Variable, 15 - Twelve Step Variable, 16 - Thirteen Step Variable, 17 - Fourteen | M | M |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Amortization Term after Modification | The number of months used to calculate the periodic payments of both principal and interest that will be sufficient to retire a mortgage obligation. | Numeric (4,0) | | M | M |
| Unpaid Principal Balance after modification | The unpaid principal balance of a loan after the loan modification.  The unpaid principal balance after modification excludes any applicable forbearance amount and can also be referred to as Net UPB Amount. | Currency (20,2) | | M | M |
| Last Paid Installment Date after modification | The due date of the last paid installment of the loan. | Date (CCYY-MM-DD) | | M | M |
| Interest Rate after modification | The interest rate in the month after loan modification. | Numeric (6,4) | | M | M |
| Interest Rate Lock Date for Modification | The date that the rate lock was applied - in reference to modification of loan terms | Date (CCYY-MM-DD) | | M | M |
| First Payment Due Date after modification | First payment due date under the modified terms | Date (CCYY-MM-DD) | | M | M |
| Principal and Interest Payment after modification | The P&I amount after modification | Currency (20,2) | | M | M |
| Escrow Payment after modification | Existing monthly payment to escrow-after modification | Currency (20,2) | | M | M |
| Monthly Housing Expense After Modification | The dollar amount per month of the borrowers housing expense after modification .May be used for their primary or non-primary residence.  This must be Principal, Interest, Taxes, Insurance and Association Dues (PITIA). | Currency (20,2) | | M | M |
| Maturity Date after modification | The maturity date of the loan after modification | Date (CCYY-MM-DD) | | M | M |
| Principal Forbearance Amount | The total amount in dollars of the principal that was deferred through loss mitigation. | Currency (20,2) | | C | C |
| Term after Modification | For loans where the term of the loan can be extended rather than increasing the principal and interest payment, this is the total term of the loan including any extension.  For all non-extendable loans, the extended term defaults to the original term. | Numeric (4,0) | | M | M |
| Front Ratio after modification | Percentage of borrower's PITIA to income ratio | Numeric (4,2) | | M | M |
| Back Ratio after modification | Percentage of borrower's PITIA plus debts to income ratio | Numeric (4,2) | | M | M |
| Principal Write-Down (Forgiveness) | Amount of principal written-down or forgiven | Currency (20,2) | | C | C |
| Paydown or Payoff of Subordinate Liens | Have sub-ordinate liens been paid off or paid down? | Boolean | True/False | C | C |
| Paydown or Payoff of Subordinate | Amount of paydown or payoff of subordinate liens | Currency (20,2) | | C | C |

| Name | Definition | Data Type | Allowable Values | Loan Setup for Trial Period Mandatory / Conditional | Official Modification Mandatory / Conditional |
|---|---|---|---|---|---|
| Liens Amount | | | | | |
| Max Interest Rate after modification | Interest rate cap for the loan. | Number (6,4) | | M | M |
| Length of Trial Period | The length of the trial period | Numeric (3,0) | | M | M |
| 1st Trial Payment Due Date | The date the 1st payment is due during the trial period | Date (CCYY-MM-DD) | | M | O |
| 1st Trial Payment Posted Date | The date the first payment posted during the Trial period | Date (CCYY-MM-DD) | | M | O |
| 1st Trial Payment Received Amount | This is the actual amount of the Payment received from the Borrower to the Servicer for the 1st Trial payment. | Currency (20,2) | | M | O |
| If the Product Type After Modification is Step Rate then at least one occurrence of the following group of fields must exist.  The first occurrence must have a step effective date of 5 years for the first effective due date after modification. | | | | | |
| Step – Interest Rate Step Number | The sequence is used to uniquely identify and order Loan Interest Rate Adjustment schedule records specific to the loan's step rate schedule. | Numeric (4) | | M | M |
| Step – Payment Effective Date | The date the payment will be effective. | Date (CCYY-MM-DD) | | M | M |
| Step – Note Rate | The interest rate in the month after loan modification. | Numeric (6,4) | | M | M |
| Step – New Interest Rate – Step Duration | After modification step duration. If this step is the last step and will be the rate and payment effective for the life of the loan, then duration is not required. | Numeric (4) | | M | M |
| Step – Principal and Interest Payment | P&I Amount - The amount of the principal and/or interest payment due on the loan for each installment, beginning on the effective date. | Currency (20,2) | | M | M |

## Exhibit B:  HAMP Monthly Trial Data Collection Elements

The following data elements are necessary for recording borrower payments during the trial period.

| Name | Definition | Data Type | Allowable Values | Mandatory/ Conditional |
|------|-----------|-----------|------------------|------------------------|
| HAMP Servicer Number | A unique identifier assigned to each Servicer that is participating in the HAMP program. | Text (30) | | M |
| Servicer Loan Number | The unique (for the lender) identifier assigned to the loan by the lender that is servicing the loan. | Text  (30) | | M |
| GSE Loan Number | A unique number assigned to each loan by a GSE (Fannie or Freddie) | Text (30) | | C |
| GSE Servicer Number | The Fannie Mae or Freddie Mac unique Servicer identifier. | Text (30) | | C |
| Trial Payment Number | The number of the trial payment being reported. The code that is used to define a single payment number that will be one of a series of payments that together will complete a loan trial payment period. | Numeric (4,0) | | M |
| Trial Payment Received Amount | The actual dollar amount of the payment received from the borrower to the servicer for the trial payment. | Currency (20,2) | | M |
| Trial Payment Posted Date | The date the payment was posted during the trial period. | Date (CCYY-MM-DD) | | M |

## Exhibit C:  Monthly Loan Activity Records

The following data elements are required for monthly loan activity records (LARs).  Step rate attributes (interest rate, rate effective date, P&I payment) will only be reported on the LAR the month before the rate change is effective.  The Action Code and Action Date are only reported when a loan is being removed (e.g., payoff, repurchase).

| Name | Definition | Data Type | Allowable Values | Mandatory/ Conditional |
|---|---|---|---|---|
| HAMP Servicer Number | A unique identifier assigned to each Servicer that is participating in the HAMP program. | Text (30) | | M |
| Servicer Loan Number | The unique (for the lender) identifier assigned to the loan by the lender that is servicing the loan. | Text (30) | | M |
| Last Paid Installment Date After Modification | The due date of the last paid installment of the loan. | Date (CCYY-MM-DD) | | M |
| Unpaid Principal Balance After Modification | The unpaid principal balance of a loan after the loan modification.  The unpaid principal balance after modification excludes any applicable forbearance amount and can also be referred to as Net UPB Amount. | Currency(20,2) | | M |
| Interest Payment | Interest portion of the P&I remitted | Currency(20,2) | | M |
| Principal Payment | Principal portion of the P&I remitted | Currency(20,2) | | M |
| Step – Payment Effective Date | The date the payment will be effective. | Date (CCYY-MM-DD) | | C |
| Step – Note Rate | The interest rate in the month after loan modification. | Numeric (6,4) | | C |
| Step – Principal and Interest Payment | P&I Amount - The amount of the principal and/or interest payment due on the loan for each installment, beginning on the effective date. | Currency(20,2) | | C |
| Action Code | A code reported by the lender to update the loan that indicates the action that occurred during the reporting period | Numeric | 60 (payoff) 65 (repurchase) 70 (liquidation held for sale) 71 (liquidation 3rd party sale/ condemnation/ assigned to FHA/VA) 72 (liquidated – pending conveyance) 76 (Deed in Lieu) 77 (Deed-in-Lieu with Jr. lien) 78 (Short Sale) 79 (Short Sale with Jr. Lien) | C |
| Action Code Date | The effective date of the action associated with the action code. The action date is required for certain action codes. | Date (CCYY-MM-DD) | N/A | C |

**Exhibit D**
**HAMP Additional Data Requirements**

Data required to be collected as specified below must be <u>reported</u> on a loan by loan basis starting on October 1, 2009.  This document does not describe all of the data that the servicer must retain; it addresses only the data that must be reported.

<u>Must be reported starting October 1, 2009 for transactions occurring before October 1, 2009</u>
- Race, ethnicity, sex of borrower and co-borrower (submission by borrower is voluntary)
- Middle name of borrower and co-borrower
- Date of birth of borrower and co-borrower
- Credit score of borrower and co-borrower
- NPV Model inputs, e.g., discount rate, flag for nonstandard model, non-standard re-default rate, non-standard cure rate
- Selected data on loan, borrower, and property characteristics as of origination, to the extent already required by OCC or OTS to be reported under "Mortgage Metrics"

The above fields must be <u>collected </u>as follows and reported starting October 1, 2009:
- all completed modifications;
- trial modifications commenced on or after July 1, 2009; and
- starting on October 1, 2009, loans evaluated for a modification (to be defined) that do not enter trial modifications.

<u>Must be reported starting October 1, 2009 (detailed definitions to be provided by June 1, 2009)</u>
- Reason loans evaluated for a modification were not modified, or that trial modification was not completed
- Status and disposition of eligible loans not modified, including trial mods not completed
- Status and disposition of loans that were modified but failed to remain in good standing because they became 90 or more days delinquent
- Second liens – flag for presence of a second lien; source of information (e.g., credit report); available terms (e.g., fixed vs. ARM; closed- vs. open-end); owner; and payoff.  Continuous tracking of second lien status is not required.
- Purpose of loan (e.g., home purchase, refinance, cash-out refi)
- Information about foreclosure suspension
- Information about reliance on non-borrower household income
- Flag for borrower in bankruptcy at time of modification
- Flag for borrower in loss mitigation prior to modification
- Information about involvement of a third party representing the borrower
- Information about mortgage insurance

# EXHIBIT

# "B"

**HELPING YOU STAY IN YOUR HOME.**



[Servicer Logo]

**You may be able to make your payments more affordable!**
**Call 1.8XX.XXX.XXX for Immediate Assistance.**

[Date]
[Name]
[Address 1]
[Address 2]                                                    [Loan number]


Dear _____

**Congratulations!** You are approved to enter into a trial period plan under the Home Affordable Modification Program. This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand all the steps you need to take to modify your mortgage payments.

**What you need to do…**
To accept this offer, you must make your first monthly "trial period payment." To qualify for a permanent modification, you must make the following <u>trial period payments in a timely manner:</u>

| |
|---|
| 1st payment: $X,XXX.XX by XX/01/XX |
| 2nd payment: $X,XXX.XX by XX/01/XX |
| 3rd payment: $X,XXX.XX by XX/01/XX |
| [4th payment: $X,XXX.XX by XX/01/XX] |

After all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified.  (Your existing loan and loan requirements remain in effect and unchanged during the trial period.)  **If each payment is not received by [mortgage servicer] in the month in which it is due, this offer will end and your loan will not be modified under the Making Home Affordable Program.**

If you have any questions or if you cannot afford the trial period payments shown above but want to remain in your home, or if you have decided to leave your home but still want to avoid foreclosure, please call us at **1.8XX.XXX.XXXX** as we may be able to help you. (Also, please review the attached "Frequently Asked Questions.")



Sincerely,

[Servicer Contact Person Name]
[Servicer Contact Person Title]
[Servicer Name]


Attachments: (1) Frequently Asked Questions and (2) Additional Trial Period Plan Information and Legal Notices

*The Making Home Affordable Program was created to help millions of homeowners refinance or modify their mortgages. As part of this program, we – your mortgage servicer – and the Federal Government are working to offer you options to help you stay in your home.*

**Q.  What else should I know about this offer?**

- If you make your new payments timely **we will not conduct a foreclosure sale.**
- You will not be charged any fees for this trial period plan or a permanent modification.
- If your loan is modified, we will waive all unpaid late charges.
- Your credit score may be adversely affected by accepting a trial period plan. The impact of a permanent modification on a credit score depends on the homeowner's entire credit profile.  For more information about your credit score, go to http://www.ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm.
- You may be required to attend credit counseling.

**Q.  Why is there a trial period?**

The trial period offers you immediate payment relief and gives you time to make sure you can manage the lower monthly mortgage payment. The trial period is temporary, and your existing loan and loan requirements remain in effect and unchanged during the trial period.

**Q.  How was my new payment in the trial period determined?**

Your trial period payment is approximately 31% of your total gross monthly income, which we determined to be $_____ based upon the income documentation you provided.  If the loan is successfully modified, your new payment also will be based on 31% of your gross income.  In addition, if your existing payment includes mortgage insurance premiums, this amount will also be added to your payment. If we were able to permanently modify your loan today, we estimate your modified interest rate would be ___%.   Your final modified interest rate may be different.

The modified payment should be sufficient to pay the principal and interest as well as property taxes, insurance premiums and other permissible escrow fees based on our recent analysis of these costs.  Your modified monthly payment may change if your property taxes and insurance premiums change.  If you did not have an escrow account before, the timing of your tax and insurance bills may require that you make a payment to cover any such bills when they come due. This is known as an escrow shortage. Your loan has an escrow shortage of $_____; this can either be paid in a lump sum when the loan is modified or over the next ___ months in an amount of $_____per month in addition to your modified monthly mortgage payment. If you wish to pay the total shortage as a lump sum, please contact us at 1.8XX.XXX.XXXX.

**Q.  When will I know if my loan can be modified permanently and how will the modified loan balance be determined?**

Once you make all of your trial period payments on time, we will send you a modification agreement detailing the terms of the modified loan. Any difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents. While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment as that is determined based on your total monthly gross income, not your loan balance.

**FREQUENTLY ASKED QUESTIONS**   Get the answers you need to some of the most common questions.

**Q.  Are there incentives that I may qualify for if I am current with my new payments?**

Once your loan is modified, you can earn a pay-for-success incentive for every month that you make on-time payments beginning with the trial period payments. Depending on your modified monthly payment, you may accrue up to $1,000 each year for five years for a maximum of $5,000. This important benefit, *which will be applied to your principal balance each year after the anniversary date of your first trial period payment due date,* will help you earn equity in your home by reducing the amount that you owe. However, you must remain current on your loan. You will lose this benefit if your modified loan loses good standing, which means that the equivalent of three full monthly payments are due and unpaid on the last day of any month, at any time during this five year period. If you lose this benefit, you will lose all accrued, unapplied incentive payments.

[In addition, once your loan is permanently modified, you may be eligible to have some of your principal forgiven on a deferred basis.  So long as your modified loan remains in good standing, we will forgive $____ of the principal balance of your loan each year on the anniversary of your first trial period payment date for three years.  You will lose this benefit if your modified loan loses good standing at any time during this three year period, including all accrued and unapplied amounts.  Any principal forgiveness will be reported to the Internal Revenue Service and may have tax consequences.  Therefore, you are advised to seek guidance from a tax professional.  Please contact us at 1.8XX.XXX.XXXX if you do not want principal forgiveness, we may have other modification options for you.]

**Q.  Will my interest rate and principal and interest payment be fixed after my loan is permanently modified?**

Once your loan is modified, your interest rate and monthly principal and interest payment will be fixed for the life of your mortgage **unless** your initial modified interest rate is below current market interest rates. In that case, the below market interest rate will be fixed for five years. At the end of the fifth year, your interest rate may increase by 1% per year until it reaches a cap. The cap will equal the market rate of interest being charged by mortgage lenders on the day your modification agreement is prepared (the Freddie Mac Primary Mortgage Market Survey® rate for 30-year fixed-rate conforming mortgages). Once your interest rate reaches the cap, it will be fixed for the remaining life of your loan. Your new monthly payment will include an escrow for property taxes, hazard insurance and other escrowed expenses. If the cost of your homeowners insurance, property tax assessment or other escrowed expenses increases, your monthly payment will increase as well.

**Q.  What if I have other questions about a Home Affordable Modification that cannot be answered by my mortgage servicer?**

Call the Homeowner's HOPE™ Hotline at **1-888-995-HOPE (4673).** This Hotline can help with questions about the program and offers access to free HUD-certified counseling services in English and Spanish.



**Q.  What if I am aware of fraud, waste, mismanagement or misrepresentations affiliated with the Troubled Asset Relief Program?**

Please contact SIGTARP at 1.877.SIG.2009 (toll-free), 202.622.4559 (fax) or www.sigtarp.gov and provide them with your name, our name as your servicer, your property address, loan number and reason for escalation. Mail can be sent to: Hotline Office of the Special Inspector General for Troubled Asset Relief Program, 1801 L Street NW, Washington, DC 20220.



**Additional Trial Period Plan Information and Legal Notices**

The terms of your trial period plan below are effective on the day you make your first trial period payment, provided you have paid it on or before [Month XX, 20XX]. You and we agree that:

**We will not proceed to foreclosure sale during the trial period, provided you are complying with the terms of the trial period plan**

- Any pending foreclosure action or proceeding that has been suspended may be resumed if you are notified in writing that you failed to comply with the terms of the trial period plan or do not qualify for a permanent modification.

- You agree that the servicer will hold the trial period payments in an account until sufficient funds are in the account to pay your oldest delinquent monthly payment.  You also agree that the servicer will not pay your interest on the amounts held in the account.  If any money is left in this account at the end of the trial period plan, those funds will be deducted from amounts that would otherwise be added to your modified principal balance.

- The servicer's acceptance and posting of your new payment during the trial period will not be deemed a waiver of the acceleration of your loan (or foreclosure actions) and related activities, and shall not constitute a cure of your default under your loan unless such payments are sufficient to completely cure your entire default under your loan.

**If your monthly payment did not include escrows for taxes and insurance, you are now required to do so:**

- You agree that any prior waiver that allowed you to pay directly for taxes and insurance is revoked. You agree to establish an escrow account and to pay required escrows into that account.

**Your current loan documents remain in effect; however, you may make the trial period payment instead of the payment required under your loan documents:**

- You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the trial period plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

# EXHIBIT

# "C"

Deed Book 11250 Pg 10
Filed and Recorded Mar-13-2000 11:45am
2000-0027053
Georgia Intangible Tax Paid $787.50

Jeanette Rozier
Clerk of Superior Court Dekalb Cty. Ga.

Gail J. SIEGEL, P.C.
Circle Building
Suite 210
2835 Brandywine Road
Atlanta, GA 30341

After Recordation Return to:
APPROVED FEDERAL SAVINGS BANK

3420 HOLLAND ROAD, #107
VIRGINIA BEACH, VA 23452

——————————— [Space Above This Line For Recording Data] ———————————

LOAN NO.: W0001783

## SECURITY DEED

THIS SECURITY DEED ("Security Instrument") is given on FEBRUARY 29, 2000   . The grantor is
PEREZ MOMON AND SHARON MOMON

("Borrower"). This Security Instrument is given to
APPROVED FEDERAL SAVINGS BANK

which is organized and existing under the laws of VIRGINIA   , and whose
address is 1716 CORPORATE LANDING PARKWAY, VIRGINIA BEACH, VA 23454-
("Lender"). Borrower owes Lender the principal sum of
TWO HUNDRED SIXTY TWO THOUSAND FOUR HUNDRED AND 00/100X X X X X X X X X X X X X X X X X X X X X X X
Dollars (U.S. $ 262,400.00   ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for
monthly payments, with the full debt, if not paid earlier, due and payable on MARCH 06, 2030
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to
protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this
GEORGIA-Single Family-FNMA/FHLMC UNIFORM INSTRUMENT       Initials: _____
VMP-6R(GA) (9502)                           Form 3011 9/90
Amended 5/91
Page 1 of 7       LENDER SUPPORT SYSTEMS INC. FNMA3011.DOT (09/98)

Deed Book 11250 Pg 11

Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in DE KALB County, Georgia:

SEE COMPLETE LEGAL DESCRIPTION DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which has the address of   5730 MASTERS COURT , STONE MOUNTAIN    [Street, City].
Georgia        30087        [Zip Code] ("Property Address");

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 *et seq.* ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Page 2 of 7

Initials:
Form 3011 9/90

Deed Book 11250 Pg 12

## EXHIBIT "A"

All that tract or parcel of land lying and being in Land Lot
65 of the 16th District of Dekalb County, Georgia and being
Lot 3, The Southland Subdivision, Unit III, as per Plat
recorded in Plat Book 90, Page 78, Dekalb County, Georgia
Records, to which reference is hereby made for the purpose of
incorporating the same herein.

Deed Book 11250 Pg 13

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Page 3 of 7            Form 3011 9/90

Deed Book 11250 Pg 14

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

Page 4 of 7                                    Form 3011 9/90

Deed Book 11250 Pg    15

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Page 6 of 7

Initials: _____

Form 3011 9/90

Deed Book 11250 Pg    16

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by applicable law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale to Borrower in the manner provided in paragraph 14 and shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by law.

If the Property is sold pursuant to this paragraph 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with applicable law.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

24. Assumption not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

25. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

26. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☒ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☒ Other(s) [specify] | | |

Waiver of Borrower's Rights and Closing Attorney's Affidavit.

Page 6 of 7

Initials:

Form 3011 9/90

Deed Book **11250** Pg    **17**

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it. IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, sealed and delivered in the presence of:

_____    _____ (Seal)
                                    PEREZ MOMON                    -Borrower

_____    _____ (Seal)
                                    SHARON MOMON                   -Borrower

_____ (Seal)    _____ (Seal)
                        -Borrower                                  -Borrower

Unofficial Witness

Notary Public,                                            County

Page 7 of 7                                    Form 3011 9/90

Deed Book 11250 Pg 18

# PLANNED UNIT DEVELOPMENT RIDER

LOAN NO.: W0001783

THIS PLANNED UNIT DEVELOPMENT RIDER is made this      29th  day of FEBRUARY, 2000      , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to APPROVED FEDERAL SAVINGS BANK

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

5730 MASTERS COURT, STONE MOUNTAIN, GA 30087

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS

(the "Declaration"). The Property is a part of a planned unit development known as THE SOUTHLAND

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP-7U (9705)          Page 1 of 3      Form 3150 9/90
LENDER SUPPORT SYSTEMS INC. RDR-3150.RDR (03/88)

Deed Book 11250 Pg 19

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then:

(i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and

(ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, with any excess paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 10.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

(i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

(ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

(iii) termination of professional management and assumption of self-management of the Owners Association; or

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

Initials:

Form 3150 9/90

Page 2 of 3

Deed Book 11250 Pg    20

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)                    _____ (Seal)
PEREZ MOMON              -Borrower                  SHARON MOMON            -Borrower

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower

_____ (Seal)                    _____ (Seal)
                        -Borrower                                          -Borrower

Page 3 of 3                                         Form 3150 9/90

Deed Book 11250 Pg 21

GEORGIA -

GRANTOR: PEREZ MOMON AND SHARON MOMON

LENDER: APPROVED FEDERAL SAVINGS BANK

DATE OF SECURITY DEED: FEBRUARY 29, 2000

LOAN NO.: W0001783

*Jeanette Rozier*
Jeanette Rozier
Clerk of Superior Court Dekalb Cty. Ga.

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:



Signed, Sealed and delivered in the presence of:

_____ *Perez Momon* _____ (Seal)
                                    PEREZ MOMON                      -Grantor

_____ *Sharon Momon* _____ (Seal)
                                    SHARON MOMON                    -Grantor

_____ (Seal)
                                                                         -Grantor

_____ (Seal)
                                                                         -Grantor

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me

on the date set forth above.

_____
Notary Public

_____
Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

_____
PEREZ MOMON

_____
SHARON MOMON

LENDER SUPPORT SYSTEMS INC. GA-01.GA (2/94)

1/94

# EXHIBIT

# "D"

Deed Book 11250 Pg   22
Filed and Recorded Mar-13-2000 11:45am
2000-0027054

Jeanette Rozier
Clerk of Superior Court Dekalb Cty. Ga.

Carl J. Stimmel, P.C.
McGill Building
Suite 210
2835 Brandywine Road
Atlanta, GA 30341

## TRANSFER AND ASSIGNMENT

For valuable consideration in hand paid, receipt whereof is hereby acknowledged, APPROVED FEDERAL SAVINGS BANK, Grantor, does hereby set over, transfer and assign unto APPROVED FINANCIAL CORP., 1716 Corporate Landing Parkway, Virginia Beach, Virginia 23454, Grantee, his/their heirs, executors, administrators or assigns, all of his/their right, title and interest in and to that certain mortgage or trust deed, together with the note it was given to secure, executed

by _Perez Momon and Sharon Momon_

to APPROVED FEDERAL SAVINGS BANK, dated the _29th_ day of _February_, 20 _04_

and duly recorded in the Office of the Clerk of Court for _DeKalb_ County, State of

Georgia, in Deed Book _____, Page _____,

Witness my/our hand and seal this _29th day of Feb, 2000_

Witness _____

Witness _____

APPROVED FEDERAL SAVINGS BANK

By _____
Eric Yeakel, Treasurer

(corporate seal)

State of Virginia
City of Virginia Beach

Before me, a Notary Public in and for the State and City aforesaid, personally appeared _Eric Yeakel_, of APPROVED FEDERAL SAVINGS BANK, who, being duly sworn according to law, did depose and say that the foregoing Transfer and Assignment was duly executed for the purposes and consideration therein expressed.

Sworn to and subscribed before me this _29th day of Feb, 2000_

My commission expires: _____
Notary Public

# EXHIBIT

# "E"

2010122202  DEED BOOK **22058** Pg **722**

Filed and Recorded:
7/28/2010 9:54:32 AM
Linda Carter
Clerk of Superior Court
DeKalb County, Georgia

MR-5158984-8

Recording Requested By: SELECT PORTFOLIO SERVICING, INC.
When Recorded Return To: Bill Koch Select Portfolio Servicing, Inc. 3815 South West Temple, Salt Lake City, Ut 84115

## CORPORATE ASSIGNMENT OF MORTGAGE

DeKalb, Georgia   SELLER'S SERVICING #: 8785185227   "MOMON"
INVESTOR #: B69
Prepared By:   BILL KOCH,   SELECT PORTFOLIO SERVICING, INC. 3815 SOUTH WEST TEMPLE, SALT LAKE CITY, UT  84115

Assignment Prepared on: July 7th, 2010.

Assignor: EQUICREDIT CORPORATION OF AMERICA BY ITS ATTORNEY-IN-FACT SELECT PORTFOLIO SERVICING, INC. F/K/A FAIRBANKS CAPITAL CORP. at C/O SELECT PORTFOLIO SERVICING, INC. 3815 SOUTH WEST TEMPLE, SALT LAKE CITY, UT  84115.
Assignee: THE BANK OF NEW YORK MELLON, F/K/A THE BANK OF NEW YORK, AS TRUSTEE FOR THE HOLDERS OF THE EQCC ASSET BACKED CERTIFICATES, SERIES 2001-1F  at C/O SELECT PORTFOLIO SERVICING, INC. 3815 SOUTH WEST TEMPLE, SALT LAKE CITY, UT  84115.

Executed By: PEREZ MOMON AND SHARON MOMON  To: APPROVED FEDERAL SAVINGS BANK
Date of Security Deed: 02/29/2000 Recorded:  03/13/2000  in Book/Reel/Liber: 11250 Page/Folio: 10  In DeKalb County , State of Georgia.

Property Address: 5730 MASTERS COURT, STONE MOUNTAIN, GA  30087

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage together with other evidence of indebtedness, said Mortgage having an original principal sum of $262,400.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

   TO HAVE AND TO HOLD the said Mortgage, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage.

EQUICREDIT CORPORATION OF AMERICA BY ITS ATTORNEY-IN-FACT SELECT PORTFOLIO SERVICING, INC. F/K/A FAIRBANKS CAPITAL CORP.
On JUL 08 2010

By: _____
Barbara Neale, Document Control Officer

WITNESS _____          WITNESS _____
Marco Villagran                    Luisa Alfonso

Witness the execution hereof by the Lender
through its duly authorized Attorney-in-Fact,
Select Portfolio Servicing, Inc.
Fka Fairbanks Capital Corp.
whose appointment was published in Deed Book
13345, Page 677, DeKalb County,
Georgia Records

"S19*318AMRC*07/07/2010 03:59:30 PM* AMRC83AMRC090000000000000433562* GADEKAL* 8785185227 GASTATE_MORT_ASSIGN_ASSN *ACK*ACKAMRC*

DEED BOOK 22058 Pg 723
Linda Carter
Clerk of Superior Court
DeKalb County, Georgia

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

STATE OF Utah
COUNTY OF Salt Lake

On ___JUL 0 8 2010___, before me, SHIRLEY TUITUPOU, a Notary Public in and for Salt Lake in the State of Utah, personally appeared Barbara Neale, Document Control Officer, EQUICREDIT CORPORATION OF AMERICA BY ITS ATTORNEY-IN-FACT SELECT PORTFOLIO SERVICING, INC. F/K/A FAIRBANKS CAPITAL CORP., personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

SHIRLEY TUITUPOU
Notary Expires: 11/12/2012 #576792

SHIRLEY TUITUPOU
Notary Public State of Utah
My Commission Expires on:
November 12, 2012
Comm. Number: 576792

(This area for notarial seal)

*S1B*S1BAMRC*07/07/2010 03:58:31 PM* AMRC63AMRC00000000000000000433592* GADEKAL* 8785185227 GASTATE_MORT_ASSIGN_ASSN *ACK*ACKAMRC*